SECURITIES AND EXCHANGE COMMISSION, Plaintiff–Appellee,

v.

Richard S. KERN, Donald R. Kern, Efi Corp., also known as Electronic Funds, Inc., Barclay Bankcard, Inc., Canyon Vista Corp., Hannah G. Irrevocable Trust, Relief Defendant, Hannah R. Trust, Relief Defendant, Defendants–Appellants,

Peter C. Lybrand, Charles Wilkins, Admiral Investments Ltd., Compulink International Corp., Drawnbridge Investment Ltd., Glitter Grove Investment Ltd., Grafton Investments Ltd., Greenford Investment Ltd., McDonalds Ltd., Oasis Enterprises Ltd., Investor Relations, Inc., Tellerstock, Inc., Conversant Enterprises, Inc., Canyon Vista Corp., Salteaux Ltd., also known as First American Security Corp., also known as First American Securities Corp., Defendants.

Securities and Exchange Commission, Plaintiff–Appellee,

v.

Charles Wilkins, Defendant–Appellant,

Hannah R Trust, Oasis Enterprises Ltd., Canyon Vista Corp., Salteaux Ltd., also known as First American Security Corp., also known as First American Securities Corp., Hannah G. Irrevocable Trust, Conversant Enterprises, Inc., Efi Corp., also known as Electronic Funds, Inc., Barclay Bankcard, Inc., McDonalds Ltd., Investor Relations, Inc., Tellerstock, Inc., Ford Investments Ltd., Glittergrove Investments Ltd., Grafton Investments Ltd., Greenford Investment Ltd., Admiral Investments, Compulink International Corp., Drawnbridge Investment Ltd., Peter C. Lybrand, formerly known as Peter C. Tosto, Richard S. Kern, Donald R. Kern, Defendants.

Docket Nos. 03–6235–CV(L), 04–0095–CV(CON).

United States Court of Appeals, Second Circuit.

Argued: Nov. 9, 2004.

Decided: Sept. 27, 2005.

Hope Hall Augustini, Senior Litigation Counsel (Giovanni P. Prezioso, General Counsel, Jacob H. Stillman, Solicitor, Meyer Eisenberg, Deputy General Counsel, on the brief), Securities and Exchange Commission, Washington, D.C., for Plaintiff–Appellee.

Eric W. Berry, New York, N.Y., for Defendants–Appellants.

Before: WALKER, Chief Judge, and POOLER and WESLEY, Circuit Judges.

POOLER, Circuit Judge.

Defendants-appellants Richard Kern, Donald Kern, Charles Wilkins, and related entities[1] appeal from the October 2, 2003, judgment of the United States District Court for the Southern District of New York (Sidney H. Stein, *J.*), in favor of plaintiff-appellee, the Securities and Exchange Commission ("Commission"), finding defendants in violation of, inter alia, the registration requirements of the Securities Act of 1933, ch. 38, 48 Stat. 74 (codified as amended at 15 U.S.C. § 77a–77aa (2000)) ("Act"). This judgment was based on an order filed May 13, 2002, granting partial summary judgment for the Commission, and an order filed September 11, 2003, imposing disgorgement and civil monetary penalties against defendants-appellants. Section 5 of the Act, 15 U.S.C. § 77e, prohibits the offer or sale of securities not registered with the Commission, while other sections of the Act provide exemptions from this requirement. Wilkins and the Kerns engaged in sales orchestrated by defendant Peter Lybrand in unregistered securities. The district court held that these sales did not fall within the exemption provided by Section 4(1) of the Act, 15 U.S.C. § 77d(1), or

within the safe harbor of Commission Rule 144, 17 C.F.R. § 230.144, or any other exemption from the requirements of Section 5. The parties then stipulated to disgorgement and injunctions against defendants-appellants prohibiting future violations of the Act. The district court, finding that the violations of Wilkins and the Kerns had involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement and had resulted in substantial losses to another person, further imposed Tier III civil monetary penalties under 15 U.S.C. § 77t(d)(2)(C).

Defendants-appellants argue that their sales are exempt from the registration requirements of Section 5 under Rule 144 or Section 4(1), and that the district court's contrary holdings are the result of misapplications of the law and of the integration doctrine. Defendants-appellants further argue that their violations were not willful or intentional, and that the losses to others have been inflated by improper inclusion of certain sales, so that Tier III civil penalties are inappropriate. We hold that the sales at issue do not qualify for the Rule 144 safe harbor. We further hold that the transactions at issue involved underwriters within the meaning of Section 2(a)(11) of the Act, 15 U.S.C. § 77b(a)(11), and thus cannot qualify for the Section 4(1) exemption. Finally, we hold that the district court did not abuse its discretion in finding that defendants-appellants acted fraudulently and that the determination of penalties should take account of losses caused by all the sales at issue here, and that the penalties imposed were thus within the permissible range of discretion of the district court.

1. Richard and Donald Kern own or control defendants-appellees EFI Corp., Barclay Bankcard, Inc., and Canyon Vista Corp. Richard Kern is the trustee of the Hannah G. Irrevocable Trust, and Donald Kern is the trustee of the Hannah R. Trust, and the Kerns' respective children are the beneficiaries of these trusts.

## BACKGROUND

Most of the facts in this case are not disputed or are definitively established by documentary evidence. Because the case was decided under Federal Rule of Civil Procedure 56, where the facts are subject to dispute, we accept the version most favorable to the non-movant defendants-appellants. Furthermore, the factual background is extensive and complex, and was well summarized by the district court below. *See SEC v. Lybrand,* 200 F.Supp.2d 384, 387–91 (S.D.N.Y.2002). Many of the facts specified or even emphasized by the parties relate only to the illegality of 1998 sales or other issues not in dispute on appeal. We therefore summarize here only those facts relevant to the limited issues argued on appeal.

This case involved three similar schemes, negotiated between Richard Kern and Lybrand, to sell to Lybrand three corporations: Polus, Inc., Citron, Inc., and Electronic Transfer Associates, Inc. ("Polus," "Citron," and "ETA," respectively, and "Issuers" collectively). The Issuers were controlled variously by Richard Kern, Donald Kern, or Wilkins ("Sellers"). *Id.* at 388. Each Issuer had been purchased or incorporated by one of the Sellers, and stock of each corporation had been distributed to friends and family of the purchase or incorporator ("Owners"). The Owners, several of whom nominally served as corporate officers of an Issuer, were not involved with any decision-making and were unaware of the nature of the company's business, all of which was instead handled by the Sellers. The Issuers were intended to be "shell corporations"—corporations that would qualify for public trading on the over-the-counter bulletin board of the National Association of Securities Dealers, and could then be sold to owners of non-publicly-traded companies. By merging their non-

public company into the publicly-traded shell, such a purchaser could cheaply take their company public.

The Sellers were approached by Lybrand at various times in 1998 with plans to purchase 90% or more of the stock of each Issuer for $150,000. Under these plans, Sellers acquired shares from the Owners. These shares were purchased with cash, no records were kept, and neither Donald Kern nor Charles Wilkins could remember even approximately how much they paid for these shares. Donald Kern testified that he set the price of these purchases, but could not remember the prices. Richard Kern testified to one purchase of a ten to fifteen percent interest in Citron for $500. After effecting ten-for-one stock splits, the reacquired shares of each Issuer were sold, via a broker, in the public market, while entities at the direction of Lybrand purchased shares at identical prices and quantities (the "Matched–Order Sales"). Officers and directors of each Issuer were also replaced by Lybrand's team on beginning the Matched–Order Sales. Lybrand used the Matched–Order Sales to illegally manipulate market prices and perceptions. Once enough of these sales had been made so that Sellers had obtained the full purchase price, the remaining shares were transferred to entities controlled by Lybrand (the "Transfers"). The Sellers retained the small number of shares that were not part of the deal (around 5% of the shares). By January 1999, Lybrand's manipulations had seen great success, and the market value of the Issuers had increased dramatically. The Sellers then sold some of their remaining shares in over-the-counter market transactions (the "Market Sales"), netting at least $6 million in profits.

Specifically, Wilkins purchased Polus in 1996. Shares of Polus were distributed to the Polus Owners. Matched–Order Sales

of Polus stock occurred between June 22 and July 14, 1998. Lybrand had an 88% interest by July 14, 1998. Transfers of Polus Stock continued up through January 1999. Citron was incorporated by Richard Kern in 1993, and shares were issued to some thirty Owners. Matched–Order Sales of Citron took place from July 13 to August 18, 1998. By August 18, 1998, Lybrand controlled 94% of the Citron stock. Transfers of Citron stock continued through January 1999. Richard Kern signed a merger agreement on behalf of Citron in January 1999. The ETA sale was slightly different. ETA was incorporated by Donald Kern in 1996. Seventy-five percent, or 1.5 million shares, of the ETA stock were issued to Richard Kern and his wife, and 25% (500,000 shares) was issued to the Owners. Matched–Order Sales started on November 4, and Transfers continued through January 1999. By January 1, 1999, at least 75% of ETA had been transferred to Lybrand.

On January 29, 1999, the Commission ordered a suspension of trading in the securities of the Issuers. On February 24, 2000, the Commission sued defendants-appellants, Lybrand, and Lybrand's related entities for securities fraud and selling unregistered securities. After discovery, the Commission moved for partial summary judgment on liability. The district court granted the motion for all claims, holding in relevant part that the Matched–Order Sales, Transfers, and Market Sales all violated the registration requirements of the Securities Act. *Lybrand,* 200 F.Supp.2d at 392–98. The parties then stipulated to disgorgement and injunctions, and the district court further imposed civil monetary penalties. *SEC v. Lybrand,* 281 F.Supp.2d 726, 729–32 (S.D.N.Y.2003). This appeal followed.

### DISCUSSION

This Court reviews a grant of summary judgment *de novo. Morales v. Quintel Entm't, Inc.,* 249 F.3d 115, 121 (2d Cir. 2001). Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All reasonable inferences must be drawn in favor of the non-moving party. *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995). The burden of demonstrating the existence of a material issue of fact as to any contention is on the shoulders of the party who would have the burden of proof as to that contention at trial. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. A federal agency's constructions of a statute that it administers are given deference by this Court, and will be ignored only if contrary to the unambiguous language of the statute or otherwise arbitrary, capricious, or abusive of discretion. *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

### I. Statutory and Regulatory Regime

Section 5 of the Act provides that securities must be registered with the Commission before any person may sell or offer to sell such securities. 15 U.S.C. § 77e. Section 4 of the Act creates a number of exemptions from this general rule. *Id.* § 77d. The exemption primarily at issue in this case is found in Section 4(1), which exempts "transactions by any person other than an issuer, underwriter, or dealer." *Id.* § 77d(1). An underwriter is defined in relevant part in Section 2(a)(11) as "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or

has a participation in the direct or indirect underwriting of any such undertaking." *Id.* § 77b(a)(11). For purposes of the underwriter definition only, an issuer includes any person controlling, controlled by, or under common control with the issuer of the securities. *Id.* In light of the purpose of the Act, exemptions generally are to be interpreted to promote full disclosure of information necessary to protect the investing public. *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124–25, 73 S.Ct. 981, 97 L.Ed. 1494 (1953).

In order to provide greater certainty and security to issuers and investors, the Commission has limited the definition of "underwriter" to exclude any person who meets the requirements of the Rule 144 safe harbor. *Id.* § 230.144(b). This consequence is precisely limited to its terms. A person who fails to comply with Rule 144 does not benefit from the safe harbor, but can still avoid underwriter status if he does not meet the statutory definition of an underwriter. *Id.* § 230.144(j). Similarly, a person who complies with Rule 144 must still show that he is neither an issuer nor a dealer to qualify for the 4(1) exemption. *See* 15 U.S.C. § 77d(1); Notice of Adoption of Rule 144 Relating to the Definition of the Terms "Underwriter" in Sections 4(1) and 2(11) and "Brokers' Transactions" in Section 4(4) of the Securities Act of 1933, Adoption of Form 144, and Rescission of Rules 154 and 155 Under that Act, Securities Act Release No. 5223, 37 Fed. Reg. 591, 592 (Jan 11, 1972) (hereinafter "Adoption of Rule 144").

Rule 144 generally affects only "restricted securities," or those securities that have never been publicly sold. 17 C.F.R. § 230.144(b), (a)(3); Loss & Seligman, *supra*, at 430. To comply with Rule 144, a person ordinarily must meet numerous requirements concerning public information, holding periods, number of shares, manner of sales, and notice to the Commission. *Id.* § 230.144(c)-(h). However, under subsection (k) of the Rule, if a person is not now and has not been an affiliate of the issuer within the last three months, and at least two years have elapsed since the securities to be sold were last acquired from an issuer or affiliate of the issuer, then that person need not comply with the other Rule 144 requirements.[2] *Id.* § 230.144(k). An "affiliate" is in turn defined as "a person that directly, or indirectly ... controls, or is controlled by, or is under common control with [the] issuer." *Id.* § 230.144(a)(1).

■ It is undisputed that none of the securities sold here were registered. To avoid liability, the Sellers must therefore demonstrate that they qualify for an exemption from the registration requirement of Section 5. On appeal, the Sellers argue only that the Polus and Citron transactions were exempt under Rule 144(k), and that the ETA transactions were exempt under Section 4(1). Furthermore, appellants argue on appeal only the legality of the January and February 1999 sales, which essentially correspond to the Market Sales. We therefore take it as conceded that the pre–1999 sales were illegal, that all defendants-appellants are liable if all the Sellers are liable, that the Polus and Citron transactions are exempt under Section 4(1) only if they qualify for the Rule 144 safe harbor under subsection (k), and that the ETA transactions are not protected by Rule 144 at all.

## II. Polus and Citron: Rule 144(k)

Rule 144(k), as discussed above, mandates both a three-month waiting period

---

**2.** The 144(k) exception by its terms does not exempt persons from the holding period requirements of 17 C.F.R. § 230.144(d), but these latter requirements are strictly less onerous than the 144(k) qualifications, and thus have no effect on the application of the Rule.

after a person ceases to be an affiliate of an issuer before that person can sell securities of the issuer, and a two-year holding period between the time the securities were acquired from the issuer or an affiliate of the issuer and the time they are resold. We hold that the Sellers cannot meet the second prong of the Rule 144(k) test. Because this holding is dispositive, we need not and do not address the first prong of the Rule 144(k) test and the arguments of the parties regarding the application of the integration doctrine.

## A. Affiliate Status of the Owners

Applying the second prong of the Rule 144(k) analysis, we conclude that the district court properly granted summary judgment because "a period of at least two years ha[d]" not "elapsed since the later of the date the securities were acquired from the issuer or from an affiliate of the issuer" before Sellers executed their Market Sales in early 1999. 17 C.F.R. § 230.144(k). Specifically, because the Sellers dominated Citron and Polus and the Owners from 1996 through late 1998, the Owners were "under common control with" Citron and Polus—the issuers relevant to the 144(k) analysis—and were therefore "affiliates" of Citron and Polus within the meaning of Rule 144(a)(1) during the period of control. Further, because only several months had passed since Citron and Polus' securities were held by non-affiliates prior to the January and February 1999 Market Sales, the Sellers fail to meet the two-year holding requirement of Rule 144(k).

Rule 144(k) requires, in part, that "a period of at least two years has elapsed since the later of the date the securities [at issue] were acquired from the issuer or from an affiliate of the issuer." Rule 144 defines "'affiliate' of an issuer" as any "person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." Id. § 230.144(a)(1). While Rule 144 fails to define "control," Rule 405 of Regulation C establishes a definition of "affiliate" identical to that of Rule 144 and defines "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person whether through the ownership of voting securities, by contract, or otherwise." Id. § 230.405.

Here, there is no serious dispute that Sellers dominated Citron and Polus up until only a few months prior to the January and February 1999 Market Sales at issue. The Sellers dominated the limited affairs pertinent to each company and orchestrated the transfer of the shells to Lybrand by agreements reached between May and June of 1998. As noted, Polus and Citron were blank-check companies. Richard Kern had founded Citron, served as its president, and served as one of only two directors, along with his wife. After founding the company, Kern distributed most of the shares in Citron to the Owners. Wilkins had "purchased 98 percent of the outstanding ... stock of Polus in July 1996" and distributed stock to the Owners. During this period, the companies observed no corporate formalities. Together, the Sellers possessed and exercised the power to direct the management of Citron and Polus by the domination of the limited affairs and transfer of the companies.

During the same period of time, Sellers also controlled the Owners. Because of this control—part of a joint scheme to acquire and transfer stock to Lybrand for distribution—the Owners were under common control with Citron and Polus by Sellers so that two years had not passed since the stock of those issuers was held by non-affiliates when Sellers executed the Mar-

ket Sales in early 1999. Therefore, 144(k)'s safe harbor is unavailable to defendants. Sellers claim that any actual control exercised over Owners by them was insufficient to establish Owners' affiliate status because "*legal* control is required to satisfy" the definition of an affiliate. Appellants' Br. at 41–42. Under the language of Rules 144(a)(1) and 405, this argument fails.

Sellers agree that Rule 405 provides the yardstick for measuring "control." Appellants' Br. at 39. Rule 405, by its language, refers to control broadly as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person whether through ownership of voting securities, contract, or otherwise." 17 C.F.R. § 230.405. (emphasis added); *see also Corr*, 543 F.2d at 1050 (2d Cir.1976) (holding that control depends in part on the *influence* of an individual). This broad language supports a "control" conclusion, where, as here, the controlling persons so dominated those controlled as to be able to gain upwards of 90% of the stock from Owners who were in a relationship of trust with Sellers. Indeed, this transaction—attempting to garner large quantities of closely held companies' stock in anticipation of public distribution—is exactly the type of transaction for which the Act was intended to require disclosure. *See generally* THOMAS L. HAZEN, THE LAW OF SECURITIES REGULATION 29–30 (5th ed.2005). The proof of control over Owners here rests in the ability of Sellers to garner overwhelming proportions of Citron and Polus' stock at a fraction of the price at which it was sold to Lybrand for distribution.[3]

We therefore conclude that the Owners and the Issuers were under the common

control of the Sellers at the time that the Sellers acquired shares from the Owners. As a result, these acquisitions were from affiliates of the Issuers within two years of the sales, and the Sellers are thereby disqualified from Rule 144(k) protection.

### B. Identity Between Owners and Sellers

The Sellers object to this analysis, arguing that the acquisition of shares from the Owners was a non-event because the individual Owners were so closely related to individual Sellers as to make them the same "person" as the relevant Seller under Rule 144(a)(2). The Sellers also point to other provisions of Rule 144 that count the holding period of a pledgee, donee, trust, or estate of an affiliate as beginning at the time the affiliate first acquired the security. They argue that these provisions demonstrate that where two persons have identical interests, their holding periods should be combined for all Rule 144 purposes.

We disagree. Turning first to the Sellers' subsection (a)(2) argument, we first note that the definition of "person" there, by its terms, does not make most of the individual Owners the same "person" as individual Sellers. Subsection (a)(2) includes in its ambit relatives living in the same home, but does not explicitly include other relatives, friends, or business associates. Even if the definition could somehow be construed to include all, or even many, of the Owners, it is applicable only for purposes of identifying "a person for whose account securities are to be sold in reliance upon this [rule]." Thus, if the Owners had sold directly into the open market, then if the subsection (a)(2) definition were met, that hypothetical sale could

---

**3.** We do not intimate that such overwhelming proof of control exercised here is necessary to satisfy the broad definition of "control" for the purposes of Rule 144, but it is clearly sufficient.

be attributed to the Sellers. However, there is nothing to indicate that a sale between individuals who might be within the subsection (a)(2) definition should not be considered an acquisition from an affiliate within the meaning of subsection (k). An example offered by Sellers, in which an affiliate assigns stock to his wholly-owned subsidiary for two years, then takes the stock back out and sells it into the market, is illustrative. Sellers claim that the market sale would be clearly exempt due to Rule 144(a)(2). In fact, exactly the opposite is true: the market sale is clearly not exempt, because the seller-affiliate controls the subsidiary, which is therefore itself an affiliate.[4]

We next turn to the Sellers' argument that identity of interests between the Owners and Sellers supports tacking on the Owners' holding period to the Sellers' for purposes of the two-year requirement of Rule 144(k). This argument fails. The Rule does not establish any general test of identical interests; rather, it enumerates specific instances where holding periods may be tacked, none of which are applicable here. 17 C.F.R. § 230.144(d)(3). Four provisions could be characterized as dealing with an identity of interests, but one of these, concerning a deceased affiliate's estate, is treated differently than the other three, suggesting again that the Commission evaluated each of these situations on its individual characteristics. *Compare* 17 C.F.R. § 230.144(d)(3)(vii) (lifting holding period limitations entirely for non-affiliate estates) *with* 17 C.F.R. § 230.144(d)(3)(iv)-(d)(3)(vi) (tacking holding periods in other circumstances).

■ Moreover, even if we were to generalize the specified tacking provisions to cover all cases of identical interests, they still would not apply to the Sellers. Subsection (d)(3) permits a selling pledgee, donee, trust, beneficiary, or estate to tack on the holding period of the affiliate pledgor, donor, settlor, or decedent, but that is all. *See* 17 C.F.R. § 2330.144(d)(3)(iv)-(d)(3)(vii). In other words, the subsection only works in one direction: it does not permit a pledgor, on reacquiring the security from the pledgee, to tack on the pledgee's holding period. Thus, to take advantage of even an expanded rule, the Sellers would have to show that they acted for the Owners and were thus entitled to stand in the Owners' shoes.[5] Instead, the evidence is clear that the reverse is true.

We therefore conclude that the Sellers' creative objections are without merit, and do not affect our conclusion that the Polus and Citron sales are not exempted from

---

4. If the seller-affiliate controls or is under common control with the issuer, then the subsidiary-affiliate is under common control with the issuer. If the seller-affiliate is controlled by the issuer, then the subsidiary-affiliate is indirectly controlled by the issuer.

5. The Sellers also rely on a no-action letter of the Commission in which a parent company, Solvay, was permitted to tack on the holding period of its wholly-owned subsidiary, Physica, because the transfer from the subsidiary to the parent involved no shift of economic risk. *Physica B.V. and Solvay S.A., SEC No–Action Letter,* 2003 WL 1883708 (April 8, 2003). Even leaving aside the fact that no-action letters have no precedential effect for this

Court, *Gryl ex rel. Shire Pharm. Group PLC v. Shire Pharm. Group PLC,* 298 F.3d 136, 145 (2d Cir.2002), the Solvay situation was explicitly predicated on the fact that Physica was a wholly-owned subsidiary. *Id.; see also* Resales of Restricted and Other Securities, Securities Act Release No. 6099, 17 S.E.C. Docket 1422 (Aug. 2, 1979). In the looser relationship between the Sellers and the Owners, there is no similar guarantee that any benefit to the Owners automatically would have inhered in the Sellers, so that transfers between Owners and Sellers does indeed shift some economic risk. Extending the wholly-owned subsidiary exception to the Owner–Seller relationship would be unjustified.

registration under Rule 144(k). As a result, we need not reach the Commission's argument that Rule 144 will not protect any sale that is part of a scheme intended to effect a public distribution without registration.

### III. ETA: Section 4(1)

■ We now consider whether the ETA sales, which concededly do not qualify for the Rule 144 safe harbor, are nonetheless exempt under Section 4(1). Although Rule 144 was intended to provide a safe harbor, it is clear that a person who does not comply with Rule 144 may still take advantage of the statutory terms of Section 4(1). *See* 17 C.F.R. § 230.144(j); Adoption of Rule 144, *supra*, at 591–92; Resales of Securities, Securities Act Release No. 5980, 1978 WL 195944, at *2 n. 8 (Sept. 20, 1978). Section 2(a)(11) defines an "underwriter" as any person who purchases with a view to distribution, offers or sells for an issuer in connection with a distribution, or participates in any distribution or underwriting. 15 U.S.C. § 77b(a)(11). For purposes of this definition only, an "issuer" is defined to include the same control persons as would be termed "affiliates" under Rule 144. *Compare* 15 U.S.C. § 77b(a)(11) *with* 17 C.F.R. § 230.144(a)(1).

The district court concluded that no exemption under Section 4(1) was available, arguing that Sellers were underwriters under Section 2(a)(11) because they sold securities with a view to distribution, and alternatively because they sold securities for an issuer in connection with a distribution. Richard Kern raises several arguments to remove himself from the reach of the underwriter definition. Because Kern and his wife had first obtained their 75% ownership of ETA in 1996 and held it until 1998, Kern argues that he could not have obtained these shares with a view to distribution. As to the 25% of shares acquired from the Owners, Kern argues that the identity of interests makes these acquisitions non-events for purposes of the statute. Finally, Kern also argues that his sales were for his own benefit, not the issuer's, so that he was not an underwriter under Section 2(a)(11).

■ Our analysis tracks the arguments of neither the district court nor Kern. Section 4(1) exempts "*transactions* by any person other than an issuer, underwriter or dealer." 15 U.S.C. § 77d(1) (emphasis added). Thus, if any person involved in a transaction is a statutory underwriter, then none of the persons involved may claim exemption under Section 4(1). *See Wolfson*, 405 F.2d at 782 (holding that where control persons sold securities through brokers, control persons could not claim exemption because brokers were underwriters under Section 2(a)(11)). Underwriters, in turn, include any person who is "engaged in steps necessary to the distribution of security issues." *SEC v. Chinese Consol. Benevolent Ass'n, Inc.*, 120 F.2d 738, 741 (2d Cir.1941).

■ There is no question that the 1998 sales involved underwriters; indeed, this has been effectively conceded by the Sellers' failure to argue that the 1998 sales did not violate Section 5. Even ignoring this concession, the profitability of Lybrand's scheme was based on the sale of securities to the public once the price had been manipulated upwards, so that the entities controlled by Lybrand acquired securities from affiliates with a view to distribution, and were therefore underwriters. As a result, the entire "transaction" is placed outside the Section 4(1) exemption.

The question, therefore, is whether the 1999 Market Sales were part of the same "transaction" as the 1998 Matched–Order Sales and Transfers for purposes of the Section 4(1) exemption. We conclude that they were. The Commission has described

a distribution as continuing throughout "the entire process by which in the course of a public offering the block of securities is dispersed and ultimately comes to rest in the hands of the investing public." *R.A. Holman & Co., Inc. v. SEC,* 366 F.2d 446, 449 (2d Cir.1966) (quoting *Lewisohn Copper Corp.,* 38 S.E.C. 226, 234 (1958)). The fact that at some point in the midst of the transfer of ETA shares to the public, Kern ceased to be an affiliate, does not permit his remaining sales to become exempt under Section 4(1). Cutting off liability partway through a distribution by a control person would permit a control person to retain some fraction of the profits from such a distribution, thereby encouraging sales made without proper disclosures— precisely the result that *Ralston Purina* instructs us to avoid in interpreting exemptions. 346 U.S. at 124–25, 73 S.Ct. 981.

We therefore conclude that as a matter of law, the 1999 Market Sales are part of the same "transaction" as the 1998 sales. Because the earlier sales undisputedly involved underwriters, the entire offering is not exempt under Section 4(1). Summary judgment was therefore properly granted as to the ETA transactions.

## IV. Civil Penalties: Section 20(d)

The Securities Enforcement Remedies and Penny Stock Reform Act of 1990, Pub.L. No. 102–409 § 101, 104 Stat. 931, 932–33 (codified as amended at 15 U.S.C. § 77t(d)), authorizes three tiers of civil monetary penalties against violators of the Act. Tier I penalties are generally applicable, 15 U.S.C. § 77t(d)(2)(A), Tier II penalties require "fraud, deceit, manipulation, or a deliberate or reckless disregard of a regulatory requirement," *id.* § 77t(d)(2)(B), and Tier III penalties require the Tier II elements plus "substantial losses or ... significant risk of sub-

stantial losses to other persons," *id.* § 77t(d)(2)(C). The tier determines the maximum penalty, with the actual amount of the penalty left up to the discretion of the district court. *Id.* § 77t(d).

After a hearing on remedies, at which the Sellers stipulated to disgorgement totaling $7 million plus interest, the district court found that defendants' violations justified Tier III penalties as fraudulent, deceitful, and resulting in substantial losses to others. It therefore ordered, in addition to the stipulated disgorgement, civil penalties totaling $1.1 million. The Sellers briefly argue that their civil penalties were unjustified, as their 1999 sales were proper and they acted without scienter during any of their sales.

The argument that losses caused by the 1999 sales were improperly included is disposed of by our above analysis concluding that the 1999 sales violated Section 5. The argument regarding scienter is similarly without merit. Assuming without deciding that scienter is necessary to an imposition of Tier III penalties, we have no difficulty in concluding that the Sellers had scienter here. The Sellers argue that they were not aware that the sales had to be registered, but they do not address whether they had scienter by virtue of knowingly providing substantial assistance to Lybrand's market manipulations. While the Sellers never admitted to such knowledge, *Lybrand,* 281 F.Supp.2d at 728, Sellers' actions indicate manipulation and their own testimony demonstrates awareness of the rising sale prices, the rising market price, and the potential for their own individual profit. Thus, evidence abounds of the Sellers' awareness of the fraudulent, market-manipulating nature of their acts.

We conclude that the district court correctly concluded that Tier III penalties were warranted. We find no abuse of

discretion in the penalties actually assessed by the district court.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.