# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SECURITIES AND EXCHANGE
COMMISSION,
                    *Plaintiff-Appellee,*

                    v.

M&A WEST INC.; SCOTT L. KELLY;
SALVATORE CENSOPRANO; ZAHRA R.
GILAK; FRANK THOMAS ECK, III,
                    *Defendants,*

                    and

STANLEY R. MEDLEY,
                    *Defendant-Appellant.*

No. 06-15165

D.C. No.
CV-01-03376-VRW

OPINION

Appeal from the United States District Court
for the Northern District of California
Vaughn R. Walker, District Judge, Presiding

Argued and Submitted
November 6, 2007—San Francisco, California

Filed August 12, 2008

Before: Sidney R. Thomas, Richard C. Tallman, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Thomas;
Partial Concurrence and Partial Dissent by Judge Ikuta

10437

**COUNSEL**

Irving M. Einhorn and Patricia G. Bell, Law Offices of Irving M. Einhorn, for the appellant.

Brian G. Cartwright, General Counsel, Jacob H. Stillman, Solicitor, Hope Hall Augustini, Senior Litigation Counsel, Tracey A. Hardin, Senior Counsel, Securities and Exchange Commission, for the appellee.

**OPINION**

THOMAS, Circuit Judge:

This case arose from the activities of M&A West, Inc. ("M&A West"), which, as the district court aptly stated, "can fairly be described as a sham incubator for startup companies." The Securities and Exchange Commission ("SEC") brought a civil law enforcement action against defendant/appellant Stanley Medley and five co-defendants. This appeal concerns the charges against Medley only. Medley was charged with violating Section 5 of the Securities Act of 1933 ("the Act"), 15 U.S.C. § 77e, for selling unregistered securities. On summary judgment, the district court held that Stanley was an underwriter under Section 2(11) of the Act, 15 U.S.C. § 77b(11), and therefore not exempt from Section 5's registration requirements under Section 4(1), 15 U.S.C. § 77(d)(1). The court also imposed remedies in the form of a

five-year injunction, civil penalties, disgorgement and pre-judgment interest. On appeal Medley argues, as he did before the district court, that he acted in reliance on Rule 144(k), 17 C.F.R. § 230.144(k),[1] a safe harbor under which persons are deemed not to be underwriters as the term is used in Section 2(11).

We conclude that the district court properly held that Medley was an underwriter, and therefore not exempt from the registration requirements. We also conclude that the district court did not err in ordering that Medley disgorge all profits, with interest, he obtained from these transactions. However, we conclude that genuine issues of material fact precluded the entry of summary judgment as to the imposition of the civil sanctions—specifically, the second-tier penalties and the five-year injunction. We therefore vacate the summary judgment on civil sanctions and remand for an evidentiary hearing.

I

The claims against Medley arise from a series of "reverse merger" transactions. A reverse merger is a transaction in which a privately-held corporation acquires a publicly-traded corporation, thereby allowing the private corporation to transform into a publicly-traded corporation without the necessity of making an initial stock offering. Often, and in the three reverse mergers at issue here, the public corporation is a shell company with minimal assets and liabilities and no actual operations. To effect the reverse merger, the shell public corporation will exchange its treasury stock for all outstanding shares of the privately-held corporation. In consideration, the controlling shareholders of the shell public corporation transfer a majority of their shares to the owners of the private cor-

---

[1]Rule 144(k) has since been repealed and replaced by Rule 144(b), which replaced the two-year holding period of Rule 144(k) with a one-year holding period. *See* Revisions to Rules 144 and 145, Exchange Act Release No. 33-8869 (December 6, 2007).

poration. After the transaction, the newly merged public corporation will assume the identity and name of the former private company. Thus, the private corporation is transformed into a publicly traded company, without going through the complicated process of an initial stock offering.

Since 1992, Medley has been in the business of assisting private corporations to become publicly-traded corporations through reverse merger transactions. Medley would identify a suitable public shell company into which the private company would merge, advise the private company, coordinate the transaction with both parties, and assist with the paperwork involved in such a transaction.

In the transactions at issue here, Medley assisted his co-defendants in arranging reverse mergers for three privately-held companies: M&A West and two of its subsidiaries. Medley helped to seek out public shell companies that were willing to enter into a reverse merger. Medley then prepared the documentation for the merger and acted as a conduit for the negotiations.

The owners of the shell companies used in these transactions were compensated largely through the retention, and eventual sale, of a small portion of the stock in the newly-merged entities. Medley was compensated for his work through both a cash fee and a block of shares in the newly-merged company. Medley and the former shell owners all entered into "lock-up" agreements allowing the immediate sale of a small portion of their shares, with the remaining shares becoming eligible for sale in blocks every month for the following six months.

A

The VirtualLender Transaction

The first reverse merger involved M&A West Financial, Inc., a wholly-owned subsidiary of M&A West. During the

merger process, M&A West Financial, Inc. was known as Virtuallender.com, Inc. ("VirtualLender"). Medley was hired in late 1998 or early 1999 to assist with arranging a reverse merger for VirtualLender. Medley identified Golden Chain Marketing, Inc. ("Golden Chain"), as a suitable public shell company for a reverse merger and prepared the documentation for the reverse merger.

The transaction was accomplished in a "Reorganization and Stock Purchase Agreement" on February 4, 1999. Under this agreement, Golden Chain and/or its shareholders transferred 95% of the outstanding Golden Chain shares to VirtualLender or its assigns, in exchange for all of the outstanding shares of VirtualLender. Golden Chain then changed its name to VirtualLender.

As part of Medley's compensation, he received 100,000 shares in VirtualLender.[2] Medley and the former Golden Chain shareholders signed lock-up agreements for the shares they retained. Medley was also paid $50,000 in cash. Within seven months of the merger, Medley sold a portion of his VirtualLender stock to the public for a profit of approximately $208,000. Within the next nine months, Medley sold additional shares to the public for a profit of approximately $10,800. No registration statement was filed for these sales.

---

[2]Medley generally arranged to have such shares transferred in the names of various entities and trusts he controlled or to Robert Bryan, whom he identified as a friend. However, the district court found that Medley did not know where Bryan lived, and had not seen Bryan in years. Because Medley does not dispute that all relevant shares were transferred as compensation for his services, and for simplicity of reference, we state merely that any such shares were transferred to Medley.

B

The M & A West Transaction

The second reverse merger involved M&A West itself and Buffalo Capital IV, Ltd. ("Buffalo Capital"), a public shell company. In April 1999, Medley prepared documents and helped facilitate a reverse merger between M&A West and Buffalo Capital. This transaction was accomplished through a two-step structure in which two separate agreements were set to close on the same day.

Under the "Reorganization and Stock Purchase Agreement," dated April 19, 1999, all of the shares of M&A West were transferred to Buffalo Capital. In exchange, M&A West and/or its assignees received 69% of the outstanding Buffalo Capital stock, including both existing shares and new shares issued from Buffalo Capital's treasury. The agreement specified that Medley was to receive 110,000 of the existing common shares from Buffalo Capital's shareholders "[a]t the closing." The agreement also provided that, on the closing date, Buffalo Capital's officers and directors would be replaced by Scott L. Kelly, an officer of M&A West. Buffalo Capital then changed its name to M&A West, Inc.

Under the separate "Stock Purchase Agreement," dated April 20, 1999, Medley and the M&A West shareholders agreed to purchase the existing shares specified in the "Reorganization and Stock Purchase Agreement" from the Buffalo Capital shareholders for $2,983. The sale was expressly contingent on the closing of the Reorganization Agreement between Buffalo Capital and M&A West. Both Agreements were scheduled to close on April 26, 1999.

Medley received 110,000 shares of stock from the officers, directors, and shareholders of Buffalo Capital. As before, Medley and the former Buffalo Capital shareholders signed lock-up agreements. Medley was also paid $75,000 in cash.

Within eleven months of the merger, Medley had sold shares of this stock to the public for a profit of $547,139. No registration statement was filed.

## C

### The Digital Bridge Transaction

The third transaction involved the reverse merger of Digital Bridge, Inc. ("Digital Bridge"), a privately-owned M&A West subsidiary, into Black Stallion Management, Inc. ("Black Stallion"), another public shell company. This merger also utilized a two-step structure. The "Reorganization and Stock Purchase Agreement" was dated January 21, 2000 and set to close on January 31, 2000. This agreement provided for the issuance of 20,000,000 new shares from Black Stallion's corporate treasury to the Digital Bridge shareholders in exchange for the outstanding Digital Bridge stock. The agreement also provided for the replacement of the current Black Stallion officers and directors with Digital Bridge shareholders by the closing date. After the closing, Black Stallion changed its name to Digital Bridge.

The Reorganization Agreement contained a "condition subsequent" clause which assumed the future closing of Stock Purchase Agreements between M&A West shareholders, including Medley, and Black Stallion shareholders, in order to effectuate the purchase of Black Stallion stock.[3] Under the clause, if the selling shareholders "fail[ed] to satisfy their

---

[3]The Reorganization agreement included the following language:

CONDITION SUBSEQUENT. This closing assumes the later closing of a STOCK PURCHASE AGREEMENT between [Black Stallion] certain shareholders of [Black Stallion] and certain buyers of [Black Stallion's] EXISTING SHARES. All Parties hereto agree that if the selling shareholders's [sic] fail to satisfy their obligations thereunder, [Digital Bridge] and [Black Stallion] shall have the right to unwind this entire transaction without imposition of any fee, charge or payment.

obligations" of the stock purchase agreements, Digital Bridge and Black Stallion retained the right to unwind the Reorganization Agreement without penalty.

The Stock Purchase Agreements, referenced in the condition subsequent clause, were dated January 31, 2000 and scheduled to close that same day, which was also the scheduled closing date for the Reorganization Agreement. In one agreement, Medley agreed to pay $20,000 for 160,000 previously existing shares (200,000 post-split) of Black Stallion from Ken Kurtz.[4] In an identical agreement dated the same day, "Robert Bryan and/or assigns" agreed to purchase another 160,000 shares (200,000 post-split) of previously issued stock from Kurtz. Medley again entered into lock-up agreements. Medley was also paid $50,000 in cash.

Between February 22, 2000, and October 3, 2000, Medley sold shares of the stock to the public for a profit of approximately $1,049,875. As with the other sales in this case, no registration statement was filed.

### D

### The SEC Complaint

On September 6, 2001, the SEC filed a complaint in the United States District Court for the Northern District of California alleging that Medley violated Sections 5(a) and 5(c) of the Securities Act (selling unregistered securities), and Section 15(a) of the Exchange Act (acting as a broker without registering as a broker). On May 12, 2005, the SEC filed a Motion for Partial Summary Judgment regarding Medley's liability for these violations. On June 20, 2005, the district court granted the motion in part, finding that Medley violated

---

[4]Kurtz had been the majority shareholder of Black Stallion prior to the issuance of new shares under the Reorganization and Stock Purchase Agreement.

Section 5 when he sold unregistered shares of VirtualLender, M&A West, and Digital Bridge to the public. The district court found that Medley was an "underwriter" under Section 2(11) because he purchased stock from persons who were controlling persons—affiliates—of the shell companies as of the dates the transactions were agreed to. The court rejected Medley's argument that he qualified for the Rule 144(k) safe harbor because the selling shareholders were no longer affiliates on the dates they delivered securities to Medley.

On October 31, 2005, the district court entered a remedies order. The district court ordered disgorgement of $1,990,750.44[5] and prejudgment interest of $657,213.85, reflecting Medley's proceeds from the sales of stock and cash payments for his work on the mergers. The district court rejected Medley's assertion that he acted in good faith and imposed second tier civil penalties of $55,000 for each merger transaction. The district court found that the permanent injunction sought by the SEC was inappropriate, but considering Medley's scienter against the sincerity of his assurance against future violations and recognition of the wrongful nature of his conduct, imposed a five-year injunction. This timely appeal followed.

II

Section 5 Charges

[1] Medley was charged with violating Section 5(a) and (c) of the Securities Act for his role in the VirtualLender, M&A West, and Digital Bridge mergers. Section 5(a) of the Securities Act provides that:

> Unless a registration statement is in effect as to

---

[5]The itemized profits listed earlier in this opinion are approximate figures and roughly add up to the total profit, as found by the district court. Medley has not challenged any of these calculations.

a security, it shall be unlawful for any person, directly or indirectly—

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

15 U.S.C. § 77e(a). Section 5(c) similarly prohibits unregistered *offers* to sell and buy unregistered securities. 15 U.S.C. § 77e(c).

[2] Section 4(1) of the Act exempts "transactions by any person other than an issuer, underwriter, or dealer" from Section 5's registration requirement. 15 U.S.C. § 77d(1). The district court held that Medley was an "underwriter" and was thus not entitled to the Section 4(1) exemption. Medley argues that he is not an underwriter and accordingly his sales of unregistered securities should fall within the Section 4(1) exemption.

[3] The term "underwriter" is defined in Section 2 of the Act:

The term "underwriter" means any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking . . . . As used in this paragraph the term "issuer" shall include, in

addition to an issuer, any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.

15 U.S.C. § 77b(11).

To aid in the interpretation of the term "underwriter," the SEC promulgated Rule 144, which creates a "safe harbor" by identifying certain conditions under which a person will be deemed to not be a statutory "underwriter." 17 C.F.R. § 230.144(b); *see also SEC v. Kern*, 425 F.3d 143, 148 (2d Cir. 2005).[6]

In part, Rule 144(k) provides a safe harbor for the unregistered sale of restricted securities:

> sold for the account of a person who is not an affiliate of the issuer at the time of the sale and has not been an affiliate during the preceding three months, provided a period of at least two years has elapsed since the later of the date the securities were acquired from the issuer or from an affiliate of the issuer. The two-year period shall be calculated as described in paragraph (d) of this section.

17 C.F.R. § 230.144(k).

[4] In other words, Rule 144(k) permits a person who is not an affiliate of the issuer, and has not been an affiliate during the past three months, to sell restricted securities without

---

[6]The Rule 144 safe harbor is not the exclusive manner in which a seller of unregistered securities can establish that he or she is eligible for the section 4(1) exemption. *See* 17 C.F.R. § 230.144(j) ("[Rule 144(k)] does not eliminate or otherwise affect the availability of any exemption for resales under the Securities Act that a person or entity may be able to rely upon."). Medley, however, argues only that he is entitled to the Rule 144 safe harbor.

complying with certain requirements[7] after they have held the securities for a period of two years. An affiliate of an issuer is defined as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." 17 C.F.R. § 230.144(a)(1).

Rule 144(k) further permits purchasers of restricted securities who acquire from non-affiliates in private transactions to comply with the two-year holding period by adding— "tacking"—the holding period of the prior non-affiliate holder to their own holding period. Tacking is not permitted, however, if the purchaser acquires the securities directly from an affiliate in a private transaction. 17 C.F.R. § 230.144(d)(1).

Medley was not an affiliate of the issuer in any of the transactions in this case, either at the time of sale or in the three months prior to the sales. He did not, however, hold the securities for at least two years. Thus, to be eligible for the safe harbor of Rule 144(k), Medley must be able to tack the holding period of the prior holder. Medley can only take advantage of tacking if the persons he acquired the securities from were not themselves affiliates of the issuer.[8]

**[5]** It is undisputed that the persons from whom Medley purchased his shares were affiliates of the public shell corporation prior to the reverse mergers.[9] Thus, to determine

---

[7]*See* 17 C.F.R. § 230.144(c) (current public information); § 230.144(e) (limitation on amount of securities sold); § 230.144(f) (manner of sale); § 230.144(h) (notice of proposed sale). Medley did not comply with these requirements and thus must satisfy Rule 144(k) to obtain Section 4(1) exemption.

[8]It is not contested that at least two years had elapsed, in each transaction, since the persons from whom Medley acquired his stock originally acquired the stock from the issuer or affiliate of the issuer.

[9]These individuals represented in their respective reorganization agreements that they controlled no less than 75% of the shares of the shell companies. The authority to transfer ownership of the company, coupled with their significant ownership stake, is more than sufficient to establish affiliate status. *See Kern*, 425 F.3d at 150.

whether Medley qualified for Section 4(1) exemption, we must determine whether or not these persons were still affiliates at the time that Medley acquired the shares. Because in each of the three transactions at issue in this case Medley acquired the securities from persons who were affiliates at the time of the transfer, we affirm the district court's grant of summary judgment with respect to the Section 5 violations.

A

The VirtualLender Transaction

**[6]** In the VirtualLender transaction involving Virtual-Lender's reverse merger into the public shell Golden Chain, Medley was compensated with shares of Golden Chain stock.[10] Medley's compensation was specified under a "Reorganization and Stock Purchase Agreement." Unlike the other two transactions in this case, the VirtualLender transaction involved a single agreement, the Reorganization and Stock Purchase Agreement. Under that agreement, dated February 4, 1999 and set to close on February 11, Medley received 100,000 shares of Golden Chain stock "at the closing." The Golden Chain shareholders were to have this stock ready for delivery "on or before" the closing date. The officers and directors of Golden Chain were also replaced "[u]pon the closing date." In other words, on the closing date two events occurred effectively simultaneously: affiliates of Golden Chain were transformed into non-affiliates, and Medley acquired Golden Chain shares from these individuals.

**[7]** We are not persuaded by Medley's argument that we should construe these simultaneous events as occurring consecutively, with the acquisition of stock following the status change of the affiliates such that Medley effectively acquired

---

[10]As with the other reverse mergers, the stock would later bear the name of the private company that was merged into the public shell. When Medley sold this stock it was labeled VirtualLender stock.

the stock from non-affiliates. Where a single transaction accomplishes both a change in status from an affiliate to a non-affiliate and a transfer of stock from that person or entity, the transfer must be viewed as a transfer from an affiliate.

**[8]** Medley began selling shares of Golden Chain as early as March 12, 1999, and the latest sales took place on June 6, 2000. Because he acquired his shares from affiliates of the issuer, he was not permitted to tack on the holding periods of the selling shareholders. *See* 17 C.F.R. § 230.144(d)(1). Medley would have had to wait until February 11, 2001—two years from the closing date—to sell his shares before he could qualify for the Rule 144(k) safe harbor. Thus, Medley did not qualify for the Rule 144(k) safe harbor, and does meet the statutory definition of an "underwriter." As an underwriter, Medley violated Section 5 by selling unregistered securities.

B

The M & A West and Digital Bridge Transactions

**[9]** Both the M & A West and Digital Bridge transactions involved more complex two-step structures. However, the result of the transactions was substantively identical. In all three transactions, Medley was compensated with shares of the relevant corporations, and in all three transactions Medley received the stock from persons who were indisputably affiliates at the time that the agreements were formed. The difference lies merely in the structure of the agreements. In the VirtualLender transaction the act which transformed the relevant affiliates into non-affiliates and the transfer of stock from those persons to Medley were both accomplished in one agreement, whereas in the M & A West and Digital Bridge transactions the two acts were accomplished in separate agreements. The mere strategic change from one document to two does not excuse Medley from liability. In both the M & A West and Digital Bridge transactions, the relevant agreements were contingent on each other. In the M & A West

Transaction, the stock transfer specified in the Stock Purchase Agreement was expressly contingent on the closing of the Reorganization Agreement. In the Digital Bridge transaction, the Reorganization Agreement contained a "condition subsequent" clause which assumed the future closing of Stock Purchase Agreements. The referenced Stock Purchase Agreements then provided for the transfer of stock to Medley. In other words, in each transaction the Reorganization Agreement and the Stock Purchase Agreements could not contractually operate independently. The failure to comply with the terms of one agreement would necessarily void the other.

**[10]** Under such circumstances, the multiple agreements actually constituted "a *single* actual transaction with multiple stages." *SEC v. Cavanagh*, 445 F.3d 105, 114 (2d Cir. 2006). We agree with our sister circuit that:

> In these circumstances, a person who is an "affiliate" during the negotiation of, and agreement to, the deal may not enjoy a Section 4(1) exemption by simply abdicating his affiliate status (e.g., by selling his controlling shares or resigning as an officer or director) shortly before the parties complete the transaction.

*Id.* at 114-15.

**[11]** In so holding, we are informed by the purpose of registration, which is "to protect investors by promoting full disclosure of information thought necessary to informed investment decisions." *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1953). The express purpose of the reverse mergers at issue in this case was to transform a private corporation into a corporation selling stock shares to the public, without making the extensive public disclosures required in an initial offering. Thus, the investing public had relatively little information about the former private corporation. In such transactions, the investor protections provided by registration

requirements are especially important. Medley's actions violated the spirit of Section 4(1) exemption, which is to allow certain persons to sell unregistered securities because those persons do not have potential access to non-public information relevant to the securities, either through their own affiliation with the relevant corporation or through the affiliation of the person from whom they obtained the securities. Here, Medley arranged to obtain the securities from persons whose status at the time of the negotiations would place Medley outside the protection of Rule 144(k), but attempted to create a loophole by creating a separate agreement which would alter that status immediately prior to what Medley would have us identify as the actual moment of the stock transfer.[11]

The Supreme Court has long instructed that securities law places emphasis on economic reality and disregards form for substance. *See SEC v. W. J. Howey Co.*, 328 U.S. 293, 298-300 (1946); *see also Danner v. Himmelfarb*, 858 F.2d 515, 518 (9th Cir. 1988); *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 481-82 (9th Cir. 1973). Where a single transaction accomplishes both a change in status from an affiliate to a non-affiliate and a transfer of stock from that person or entity, the transfer must be viewed as a transfer from an affiliate for the purposes of determining Rule 144(k) eligibility. The existence of multiple agreements bears little effect when

---

[11]The dissent suggests there is nothing in the record to establish that Medley or his nominee signed the initial stock purchase and sale agreements for the M&A West and Digital Bridge transactions. However, this concern is misplaced. First, Medley has never denied that he assisted in arranging the reverse mergers and was compensated for his services partially with stock of the newly merged companies. More specifically, the supplemental excerpts of record provided by the SEC to this Court contain the following documents: a Lock-up Agreement for stock obtained in the M&A West transaction, signed by Medley; a Stock Purchase Agreement for the Digital Bridge transaction, signed by Medley; a Lock-up Agreement for the Digital Bridge transaction, signed by Medley; a Stock Purchase Agreement for the Digital Bridge transaction signed by Medley's nominee Robert Bryan; and a Lock-up Agreement for the Digital Bridge transaction signed by Bryan.

the agreements collectively constitute a single transaction. Thus, the district court properly held that Medley violated Section 5 when he sold unregistered shares of VirtualLender, M&A West, and Digital Bridge to the public.

## III

### Remedies

Upon finding that Medley committed Section 5 violations in the three reverse merger transactions discussed here, the district court imposed three forms of penalties. First, the district court ordered Medley to disgorge, with pre-judgment interest, the salary and profits from stock sales for the three reverse merger transactions. Second, the court ordered a total civil penalty of $165,000, based on three "second-tier" civil penalties of $55,000 each. Finally, the court granted a five-year injunction against any future violations of Sections 5(a) and 5(c) of the Securities Act. We affirm the district court's disgorgement order, but remand for further proceedings before any second-tier penalties or injunction may be imposed.

### A

### Disgorgement

[12] The district court ordered disgorgement, with interest, to ensure that Medley is not allowed to benefit from his unlawful conduct. "The district court has broad equity powers to order the disgorgement of 'ill-gotten gains' obtained through the violation of the securities laws." *SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998). Through his involvement in the three reverse mergers, Medley violated Section 5 of the Securities Act and was compensated for his efforts. The district court properly calculated Medley's profits from these mergers, including the cash payments he obtained and his profits from his stock sales. We affirm the district

court's order that Medley disgorge $2,647,964.29 in profits and pre-judgment interest.

B

Second Tier Penalties

The district court also imposed civil penalties for three "second-tier" Securities Act violations. A second-tier penalty is an intermediate level sanction that can be imposed only if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." 15 U.S.C. § 77t(d)(2)(B). Thus, unlike disgorgement, the imposition of second-tier penalties requires an assessment of scienter.

On summary judgment, a district court must determine whether genuine issues of material fact exist, and must resolve any uncertainty in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). While the district court properly determined that no genuine issue of material fact existed with respect to whether Medley violated Section 5 of the Securities Act, the district court's imposition of second-tier penalties was improper at the summary judgment stage. Medley presented evidence to the district court that he believed his sales of securities were exempt from registration requirements through the Rule 144 safe harbor. In addition to his own testimony, Medley submitted legal opinions, upon which he claims he relied, to support his argument that he acted in good faith. Even though the district court did not find Medley's evidence persuasive, this evidence does create a material issue of fact as to Medley's state of mind during the transactions and thus creates a question as to whether Medley's actions "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," 15 U.S.C. § 77t(d)(2)(B).

**[13]** In rejecting the evidence Medley produced to demonstrate his good faith, the district court made a credibility

determination. This Court, and others, "have long recognized that summary judgment is singularly inappropriate where credibility is at issue. Only after an evidentiary hearing or a full trial can these credibility issues be appropriately resolved." *SEC v. Koracorp Indus., Inc.*, 575 F.2d 692, 699 (9th Cir. 1978). The district court's assessment of Medley's credibility may ultimately be correct, but such an assessment may only be made after a full evidentiary hearing, and is inappropriate at the summary judgment stage.

C

Injunction

Likewise, the district court's decision to impose an injunction also requires an assessment of scienter. To justify an injunction, there must be "a reasonable likelihood of future violations of the securities laws." *SEC v. Murphy*, 626 F.3d 633, 655 (9th Cir. 1980). In predicting this likelihood a court should consider the totality of the circumstances, including: "(1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the likelihood, because of defendant's professional occupation, that future violations might occur; (5) and the sincerity of his assurances against future violations." *SEC v. Fehn*, 97 F.3d 1276, 1295 (9th Cir. 1996). For the same reasons that the district court found second-tier penalties appropriate, the court found that the first factor, the degree of scienter involved "strongly favors the SEC."

**[14]** Once again, the district court's decision was premature. Medley has presented evidence that he acted in good faith and was unaware that he was violating securities laws. An assessment of his credibility must await a full evidentiary hearing.

IV

In summary, we affirm the district court's finding that Medley violated Sections 5(a) and 5(c) of the Securities Act through his involvement in the three reverse mergers discussed previously. Additionally, we affirm the district court's order that Medley disgorge all profits, with interest, he obtained from these transactions. However, we reverse the district court's imposition of civil sanctions—in the form of second-tier penalties and a 5-year injunction—and remand for a full evidentiary hearing before any penalty requiring an assessment of scienter may be imposed.

AFFIRMED in part, REVERSED and REMANDED in part. Each party shall bear his or its own costs.

_____

IKUTA, Circuit Judge, concurring in part, dissenting in part:

I agree with the majority that the district court did not err in determining that Medley's sale of stocks acquired in the Golden Chain transaction violated the Securities Act. I dissent from part II.B of the majority, however, because Medley's activities in the M&A West/Buffalo Capital and Digital Bridge/Black Stallion transactions were protected by the safe harbor in 17 C.F.R. § 230.144(k). The majority's interpretation of Rule 144(k) sacrifices the plain language of the regulation to general policy goals that the SEC failed to express in its own regulations. Such an approach is manifestly unfair to the regulated community, which is entitled to structure its affairs in reliance on the plain language of a safe harbor regulation. The SEC is free to amend and clarify its regulations to ensure that the safe harbor is used in a manner consistent with its goals.[1]

_____

[1]Indeed, the SEC has done just that. Shortly after this appeal was argued, the SEC substantially revised Rule 144, 17 C.F.R. § 230.144. *See*

The majority correctly lays out the applicable law. Rule 144(k) provides a safe harbor from the general prohibition on the sale of unregistered, restricted securities. A seller qualifies for the safe harbor if (i) the seller is not an affiliate of the issuer at the time of the sale and was not an affiliate of the issuer during the three months prior to the sale, and (ii) a period of at least two years has elapsed since the securities were last acquired from the issuer or an affiliate of the issuer. 17 C.F.R. § 230.144(k). The word "affiliate" is defined by Rule 144(a)(1) as follows: "[a]n affiliate of an issuer is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." The time period during which any previous owner held the securities counts towards the two-year requirement, allowing the seller to tack his holding period to the prior owner's period. However the two-year clock resets every time the securities are acquired from an issuer or an affiliate of the issuer. § 230.144(k).

Medley did not wait two years before selling his shares, so he qualifies for the Rule 144(k) safe harbor only if he can validly tack his holding period onto the previous owners' holding periods. He cannot use tacking to meet the two-year requirement if the previous owners were affiliates of the issuer at the time Medley acquired his shares. § 230.144(k). Therefore, the key question in this case is whether the persons who transferred their shares to Medley were "affiliates" as defined by Rule 144(a)(1) at the time Medley acquired those shares.

---

Revisions to Rules 144 and 145, Exchange Act Release No. 33-8869 (December 6, 2007). New Rule 144(i)(1) makes Rule 144 unavailable, with limited exceptions not at issue in this case, to issuers that have at any time had "(A) No or nominal operations; and (B) Either: (1) No or nominal assets; (2) Assets consisting solely of cash and cash equivalents; or (3) Assets consisting of any amount of cash and cash equivalents and nominal other assets." While the parties have not briefed the subject, this revised regulation appears to target the precise sort of reverse merger transactions at issue here.

With respect to the M&A West and Digital Bridge transactions, the parties do not dispute that the persons who transferred their shares to Medley did not meet the definition of "affiliate" during the stage of the transaction in which Medley acquired those shares. After the Reorganization and Stock Purchase Agreement was implemented, the transferors resigned and were no longer officers or directors of the corporations, and their shares had been diluted so they no longer had control of the corporations. In light of the interlocking nature of these agreements in the reverse merger transaction, and in light of the SEC's policy goals, the majority simply asserts that because the prior owners of the securities were affiliates when the original Reorganization and Stock Purchase Agreement was signed, they are deemed to be affiliates during a subsequent stage in the transaction when a third party acquires those shares. Under this interpretation, it may be irrelevant whether the person who ultimately acquires the securities was even a party to the transaction. For example, in this case, nothing in the record establishes that Medley or his nominee even signed the initial Reorganization and Stock Purchase Agreements.[2]

The plain language of Rule 144(k) provides no support to the majority's interpretation. Rule 144(k) provides a safe harbor when "a period of at least two years has elapsed since the later of the date the securities were acquired from the issuer or from an affiliate of the issuer." The majority does not assert that Medley "acquired" the securities at the time the owners entered into the Reorganization and Stock Purchase Agreement. Nor could it: Using words in their natural sense,[3] Med-

----

[2]While the majority is correct that the record contains subsequent agreements related to Medley's acquisition of the shares, maj. op. at 10455 n.11, the majority does not dispute that nothing in the record establishes that Medley or his nominee signed the initial Reorganization and Stock Purchase Agreements.

[3]"Acquired" is not defined in Rule 144, or in any related rules or statutes. Therefore, we look to the common sense meaning of the word, including dictionary definitions. *See United States v. Pearson*, 274 F.3d 1225, 1231 n.6 (9th Cir. 2001). Dictionary definitions of "acquire" include "[t]o gain possession or control of; to get or obtain," Black's Law Dictionary 25 (8th ed. 2004), and "to come to have as one's own; get possession of," Webster's New World College Dictionary 12 (4th ed. 2005).

ley did not acquire the shares at issue until he had actual possession or control of them, which took place after the transferors in the M&A West and Digital Bridge transactions ceased to be affiliates. As mentioned above, the parties do not dispute that the transferors in the two transactions did not meet the definition of "affiliate" in Rule 144(a) during the stage of the transaction in which Medley acquired the securities. In fact, the majority's interpretation is untethered to any language in the applicable regulations or statutes; and is not based on any authoritative interpretation by the SEC to which we must defer. In my view, this interpretive approach is not reasonable.

*SEC v. Cavanagh*, 445 F.3d 105 (2d Cir. 2006), does not support the majority's interpretation of Rule 144(k). *Cavanagh* interpreted Section 4(1), 15 U.S.C. § 77d(1), not Rule 144(k). Section 4(1) provides that Section 5's registration provisions do not apply to "transactions by any person other than an issuer, underwriter, or dealer." In interpreting this language, *Cavanagh* held that a multi-stage transaction counted as a single "transaction" for purposes of qualifying for an exemption to sell unregistered securities. *Cavanagh*'s interpretation of the word "transaction" in Section 4(1) may be reasonable, but its analysis cannot help us construe the word "acquired" in Rule 144(k). The majority has borrowed the holding in *Cavanagh* while jettisoning the reasoning that led up to it.

Because Medley established that he qualified for the safe harbor in Rule 144(k) for the M&A West and Digital Bridge transactions, I would reverse the district court's grant of summary judgment and disgorgement with respect to those transactions. I otherwise concur in the majority opinion.