# United States Court of Appeals
## For the First Circuit

Nos. 23-1669, 23-1812

U.S. SECURITIES AND EXCHANGE COMMISSION,

Plaintiff, Appellee/Cross-Appellant,

v.

HENRY B. SARGENT,

Defendant, Appellant/Cross-Appellee,

FREDERICK M. MINTZ; ALAN P. FRAADE;
JOSEPH J. TOMASEK; PATRICK GIORDANO,

Defendants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Barron, Chief Judge,
Lynch and Kayatta, Circuit Judges.

Peter R. Ginsberg, with whom Christopher Neff and Moskowitz
Colson Ginsberg & Schulman LLP were on brief, for appellant/cross-
appellee.

Paul G. Álvarez, Senior Appellate Counsel, Securities and
Exchange Commission, with whom Megan Barbero, General Counsel,
Michael A. Conley, Solicitor, and Daniel Staroselsky, Assistant
General Counsel, were on brief, for appellee/cross-appellant.

February 13, 2025

**KAYATTA**, **Circuit Judge**.  This appeal arises from a civil enforcement action brought by the Securities and Exchange Commission (SEC) against Henry B. Sargent, who allegedly violated registration and antifraud provisions of the federal securities laws.  The district court awarded partial summary judgment to the SEC on its claim that Sargent violated section 5 of the Securities Act of 1933 (the "Act") by directing a series of transactions as part of an unregistered public offering of penny stocks.  The district court also ordered various equitable remedies, including disgorgement and a ten-year ban on Sargent's ability to trade penny stocks.  Finally, the district court dismissed the SEC's fraud claims and rejected its request for an additional civil penalty.

Both Sargent and the SEC appealed.  Sargent first challenges the district court's partial grant of summary judgment, arguing that his transactions were exempt from registration (or at least that a jury could so find).  Sargent further challenges the district court's remedial order, arguing that the district court abused its discretion in imposing the ten-year penny-stock ban and in calculating the disgorgement amount.  Meanwhile, the SEC argues that the district court erred in refusing to order a civil penalty while dismissing its fraud claims.

We now affirm the district court's grant of partial summary judgment, the amount it ordered in disgorgement, and its dismissal of the SEC's fraud claims.  We also hold that the

district court erred both in imposing equitable remedies and in concluding that it lacked the power to issue a civil penalty. Our reasoning follows.

## I.

"'On review of an order granting summary judgment, we recite the facts in the light most favorable to the nonmoving party' to the extent that they are supported by competent evidence." Ellis v. Fidelity Mgmt. Tr. Co., 883 F.3d 1, 3 (1st Cir. 2018) (quoting Walsh v. TelTech Sys., Inc., 821 F.3d 155, 157-58 (1st Cir. 2016)); see also Burns v. State Police Ass'n of Mass., 230 F.3d 8, 9 (1st Cir. 2000) (noting that competent evidence is necessary to defeat summary judgment). We therefore refer to the undisputed material facts set out in the district court's summary judgment decision, see SEC v. Sargent, 589 F. Supp. 3d 173, 181-83 (D. Mass. 2022), and take additional undisputed facts "from the record at large where appropriate," Ellis, 883 F.3d at 3.

## A.

In August 2014, Sargent incorporated BMP Holdings, LLC ("BMP"), the business of which thereafter included operating a yoga studio. Sargent served as BMP's chief executive officer, chief financial officer, majority shareholder, and sole director.[1]

---

[1] Sargent also worked at Southridge Capital Investment ("Southridge"), a financial services firm.

Between September and December 2014, Sargent caused BMP to issue 168,000 shares to thirty-two individuals (the "S-1 shareholders") for $0.01 per share, or $1,680 in total. The S-1 shareholders ranged from Sargent's family, friends, and business associates, to family members of those business associates, to additional individuals those associates brought in whom Sargent did not personally know. Sargent's purpose in recruiting the S-1 shareholders was not to fund BMP's operations but to "get a shareholder base" so he could take BMP public. Some S-1 shareholders were not aware of anything about BMP's operations other than that it was a "shell company."

In January 2015, Sargent caused BMP to issue 5,000,000 shares to himself, in exchange for his interest in a small yoga studio (which he had operated at a loss). In May 2015, Sargent caused BMP to file a Form S-1 registration statement with the SEC, which became effective in August of that year. The Form S-1 registration provided a mechanism by which the S-1 shareholders could publicly sell or otherwise dispose of their shares. In September 2015, Sargent caused a brokerage firm to file a Form 15c2-11 application with the Financial Industry Regulatory Authority (FINRA) on BMP's behalf. This application, which FINRA approved in January 2016, cleared BMP's stock to be quoted publicly on the over-the-counter (OTC) market. In May 2016, Sargent caused BMP to issue him another 245,000,000 shares, which reduced BMP's

state tax liability.  Notwithstanding taking these steps, Sargent did not inform any S-1 shareholders at the time that he had filed the Form S-1, nor that as of January 2016, they could sell their BMP shares on the OTC market.

In May 2016, BMP's lawyer and various consultants began negotiating over the potential acquisition of BMP by PixarBio, a biotech company located in Massachusetts.  As those negotiations continued, in July 2016, Sargent sent stock powers -- legal documents that transfer stock ownership -- to the S-1 shareholders. The shareholders signed the stock powers, leaving the buyer blank, and sent them back to Sargent.

On August 19, 2016, Sargent and PixarBio executed a stock-purchase agreement as part of what the SEC alleged was a reverse merger.[2]  Under the agreement, Sargent transferred 5,000,000 shares of his restricted BMP stock to PixarBio for $108,500;  the agreement also provided that PixarBio would contribute $191,500 to satisfy an outstanding loan from Sargent to

_____

[2]  "A reverse merger is a transaction in which a privately-held corporation acquires a publicly-traded corporation, thereby allowing the private corporation to transform into a publicly-traded corporation without the necessity of making an initial stock offering." United States v. Weed, 873 F.3d 68, 70 n.2 (1st Cir. 2017) (quoting SEC v. M & A W. Inc., 538 F.3d 1043, 1046-47 (9th Cir. 2008)).  "To effect the reverse merger, the shell public corporation will exchange its treasury stock for all outstanding shares of the privately-held corporation.  In consideration, the controlling shareholders of the shell public corporation transfer a majority of their shares to the owners of the private corporation." Id. (quoting M & A W. Inc., 538 F.3d at 1046-47).

BMP, and $25,000 to pay certain BMP operating expenses, for a total sum from PixarBio of $325,000. Sargent also promised to deliver agreements for six-month "lockups" with certain S-1 shareholders owning 25,000 shares of BMP S-1 stock. As part of the transaction, PixarBio also cancelled the other 245,000,000 shares in Sargent's name, and a few months later cancelled the remaining shares it had acquired from Sargent. Sargent resigned as BMP's president and director the same day as the stock-purchase agreement, August 19, although his director resignation did not become effective until September 15.

Meanwhile, around the same time that Sargent signed the stock-purchase agreement with PixarBio, the S-1 shareholders' shares were transferred using the signed blank stock powers, some to Sargent and the rest to Jay Herod and Patrick Giordano, both of whom were associated with PixarBio. Specifically, on August 15, Giordano executed a stock-purchase agreement purporting to buy 10,000 shares from two S-1 shareholders for $0.02 per share. On August 23, Herod executed a stock-purchase agreement buying 130,000 shares from twenty-five of the twenty-nine S-1 shareholders for the same price.[3] And Sargent executed an agreement, also dated August 15, buying 10,000 shares from his

_____

[3] There were only twenty-nine S-1 shareholders at this point because three investors had assigned their shares to another S-1 shareholder, Bodhnarine Persaud, in the interim.

sister for $0.10 per share. Sargent then acquired another 18,000 shares from Bodhnarine Persaud, one of the S-1 shareholders and a colleague at Southridge, and paid him $2,000 (around $0.11 per share) by check dated September 20, 2016.

On October 11, 2016, BMP (now under the control of PixarBio affiliates) declared a nine-for-one stock dividend. On October 30, PixarBio merged with BMP. Thus, the BMP shares owned by Herod, Giordano, and Sargent -- i.e., the only shares of BMP available for sale on the public market -- became shares of PixarBio and multiplied by ten. As a result, the 28,000 shares that Sargent purchased from Persaud and his sister became 280,000 PixarBio shares. However, Sargent's shares were still subject to the contractual lockups that Sargent had delivered to PixarBio, as promised in the August 19 stock-purchase agreement.

On October 31, 2016, public trading of PixarBio stock opened at $3.00 per share on the OTC market. In the meantime, PixarBio and its officers had allegedly orchestrated a "pump-and-dump" scheme -- including by making false representations in the company's Form 8-K filed with the SEC -- that caused the market value of PixarBio stock to quickly surge.[4] PixarBio's stock closed at $4.77 on October 31, $11 on November 1, and $30 on November 2.

---

[4] The SEC instituted an enforcement action against PixarBio and its officers in a different case. See Complaint, SEC v. PixarBio Corp., No. 1-18-cv-10797, 2017 WL 8942305 (D. Mass. Apr. 24, 2017).

On November 2, PixarBio released Sargent from the contractual lockup on his 280,000 shares. Sargent began trading the next day. Over the following two-and-a-half months, Sargent sold around 40% of his shares, earning $627,979 in profits. Herod and Giordano respectively earned around $900,000 and $115,000 in profits during the same general time period.

On January 23, 2017, the SEC suspended public trading in PixarBio stock.

**B.**

In June 2019, the SEC brought this civil enforcement action against Sargent and a group of co-defendants, alleging violations of the registration and antifraud provisions of the federal securities laws.

After discovery, the SEC moved for partial summary judgment on its section 5 registration claim, which the district court granted. Sargent, 589 F. Supp. 3d at 180. The district court first concluded that the SEC had established a prima facie case that Sargent had violated section 5 by failing to register the sales to the public of BMP (PixarBio) stock he had acquired from the S-1 shareholders. Id. at 187–91. The court then held that the undisputed facts established that Sargent was an "underwriter" and that Sargent thus failed to carry his burden to show that those sales were exempt from registration under section 4(a)(1) of the Act. Id. at 191–206.

In April 2022, the SEC tried its fraud claims before a jury, which resulted in a unanimous verdict against Sargent. See SEC v. Sargent, 66 F.4th 11, 13 (1st Cir. 2023). However, after the verdict was announced, the district court denied Sargent's request to individually poll the jurors, as required by Federal Rule of Civil Procedure 48(c). On interlocutory review, this court held that the district court's failure to poll the jurors constituted reversible error, such that Sargent was entitled to a new trial. Id. at 12.

Back in the district court, the SEC sought various remedies for its section 5 claim on which the court had granted partial summary judgment. Those remedies included a permanent injunction, a permanent prohibition on Sargent's participation in penny stock offerings, disgorgement of Sargent's ill-gotten gains from his section 5 violation, and a single first-tier civil penalty of $630,979. After an evidentiary hearing and remedies briefing -- including as to whether the district court could order a civil penalty for Sargent's section 5 violation even though the SEC's fraud claims were scheduled for retrial before a jury -- the district court issued a nonfinal partial judgment awarding equitable remedies for Sargent's section 5 violation.

That nonfinal order, dated July 12, 2023, laid out several equitable remedies: (1) a permanent injunction barring Sargent from committing future section 5 violations, (2) a ten-

year ban prohibiting Sargent from participating in any offerings of penny stocks (those tradeable for less than $5.00 per share), and (3) a disgorgement of $562,786 in net profits from Sargent's section 5 violations and $142,132 in prejudgment interest. However, with the SEC's fraud claims scheduled for retrial, the court explained that it lacked the constitutional power to impose a monetary penalty for Sargent's section 5 violation "absent a jury verdict or a ruling that obviates the need for a jury." The district court thus refrained from imposing a nonfinal monetary penalty. Citing the fraud retrial, the district court also stayed entry of its partial judgment "until appropriate."

The SEC then submitted a notice contesting -- as it had previously -- the notion that the district court lacked the authority to issue a civil penalty for the section 5 violation. The SEC stipulated that to the extent the court saw the outstanding retrial of the fraud claims as a legal impediment thereto, the SEC would seek authorization to file a motion to dismiss its fraud claims "upon entry of a final order granting all equitable relief set forth in the [district court's] July 12, 2023 Order and any civil penalty the [c]ourt deems appropriate."

Shortly thereafter, on August 11, 2023, the SEC filed a "Motion for Entry of Order Concurrently Granting Certain Relief and Dismissing Fraud Claims." The SEC asked that the district court enter "an order or orders that concurrently: (1) provide all

of the relief set forth . . . in the Court's July 12, 2023 Order; (2) impose a civil penalty of $630,979 or, if needed, set a hearing regarding imposition of a civil penalty as soon as is practicable; and (3) dismiss the [SEC's fraud claims] as to Sargent . . . ."

On September 6, 2023, the district court issued a minute order dismissing the SEC's fraud claims with prejudice, without imposing any civil penalty for Sargent's section 5 violation. The district court noted that it "ha[d] no power to award a penalty herein where a jury trial has been asserted and not waived." The court declared its July 12 nonfinal order a final judgment.

This appeal and cross-appeal followed.

## II.

### A.

We start with Sargent's appeal of the district court's order summarily entering judgment against Sargent on the section 5 claim. Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review the district court's order granting summary judgment de novo, drawing all reasonable inferences in favor of the party against whom summary judgment was entered. See Gibson Found., Inc. v. Norris, 88 F.4th 1, 5 (1st Cir. 2023).

- 12 -

The district court found, and Sargent does not contest on appeal, that the SEC's undisputed evidence established a prima facie showing that Sargent violated section 5 by failing to register the sales of PixarBio stock he acquired from Persaud.[5] Sargent, 589 F. Supp. 3d at 182, 187-91; see also 15 U.S.C. § 77e (requiring that securities be registered with the SEC before they are sold). So the SEC's claim that Sargent violated section 5 turns on whether he qualified for an exemption to section 5 -- in this case, section 4(a)(1), which exempts from liability "transactions by any person other than an issuer, underwriter, or dealer." 15 U.S.C. § 77d(a)(1). An "underwriter" is "any person who has purchased from an issuer with a view to . . . the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or

---

[5] Sargent also purchased S-1 shares from his sister but asserts that he "continues to hold th[ose] shares." The SEC does not challenge this assertion. Nor does Sargent contest the district court's disgorgement award on the basis that it inappropriately considered profits from his sale of S-1 shares acquired from his sister. Thus, we need only focus on Sargent's sale of the shares he acquired from Persaud.

Nor need we address Sargent's possible liability for facilitating the transfer of S-1 shares to Herold and Giordano, since the district court did not reach that issue. See Sargent, 589 F. Supp. 3d at 191 (noting that Herod's and Giordano's sales were unregistered); id. at 198 & n.18 (clarifying that the court "only ruled as matter of law that Sargent violated section 5 based on his sales to the public, not those of Herod and Giordano").

has a participation in the direct or indirect underwriting of any such undertaking." Id. § 77b(a)(11); see also SEC v. Big Apple Consulting USA, Inc., 783 F.3d 786, 807 (11th Cir. 2015) ("The definition of 'underwriter' in the [Act] 'is expansive.'" (quoting SEC v. Platforms Wireless Int'l Corp., 617 F.3d 1072, 1086 (9th Cir. 2010))). And as relevant to the definition of an "underwriter," an "issuer" is anyone who issues or proposes to issue a security, including "any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer." 15 U.S.C. § 77b(a)(11).

Because judgment against Sargent was entered without a trial under Federal Rule of Civil Procedure 56, the precise issue before this court is whether he has come forward with facts that would support a jury finding that the section 4(a)(1) exemption applied. See SEC v. GenAudio Inc., 32 F.4th 902, 941 (10th Cir. 2022) (explaining that, once the SEC established a prima facie case, it became defendant's burden to demonstrate a genuine dispute of material fact that an exemption applied). To carry his burden, Sargent "must point to evidence affirmatively tending to prove the fact in [his] favor." FDIC v. Elder Care Servs., Inc., 82 F.3d 524, 526 (1st Cir. 1996).

Sargent devotes much of his brief to criticizing the district court's reliance on a so-called "presumption of the middle

ground" in finding that Sargent controlled the S-1 shareholders, and its reliance on the price at which Sargent sold his S-1 shares due to PixarBio's pump-and-dump scheme. See Sargent, 589 F. Supp. 3d at 187. As the SEC points out, however, given that our review is de novo, the question is whether the district court ended up in the correct place, not whether it took the correct analytical route to get there.[6] In other words, "[b]ecause appellate review is plenary," Perez v. Volvo Car Corp., 247 F.3d 303, 310 (1st Cir. 2001), we may "reject the rationale employed by the lower court and still uphold its order for summary judgment," Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999). In this respect, the law is clear that we may affirm a judgment on "any independently sufficient ground." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991). And for the following reasons,

---

[6] To be sure, we reject the district court's application of its so-called "presumption of the middle ground" insofar as it is anything other than a metaphor for strong evidence in support of a particular conclusion. That is, because Sargent had the burden to show that a jury could find him not to be an underwriter, it was not error for the court to consider facts regarding the share-price disparity and the timing of Sargent's sale of shares to be strong evidence suggestive of Sargent's underwriter status. In that regard, the district court's use of its so-called "presumption" to redescribe the strength of that evidence was harmless. See Sargent, 589 F. Supp. 3d at 196–206. However, because the issue of "control" requires a totality-of-the-circumstances inquiry, see id. at 185, we reject the notion that a court "may grant summary judgment [as to a defendant's underwriter status] if the price disparity is established (and not rebutted)," irrespective of other evidence to the contrary, id. at 201.

- 15 -

we conclude that any properly instructed jury would have to agree with the SEC that Sargent committed a section 5 violation through his sale of shares.

Although the law under section 4(a)(1) is certainly reticulated, the key point for our purposes is that Sargent did not qualify for the exemption if he (1) acquired any of the S-1 shares with a view to distribution, (2) controlled any of the S-1 shareholders from whom he acquired the shares, and (3) controlled BMP. See 15 U.S.C. §§ 77b(a)(11), 77d(a)(1). We address each issue in turn, training our attention on Sargent's dealings with Persaud.

**1.**

Sargent argues that because the S-1 shares he purchased from Persaud were subject to Sargent's contractual lockup, he did not purchase the shares with a view to distribution. Sargent did not make this argument below, so it is forfeited -- allowing, at most, plain-error review. See Universitas Educ., LLC v. Granderson, 98 F.4th 357, 373 (1st Cir. 2024). And on the merits, there is no plain error. The lockup agreement term lasted a mere six months; thus, even if PixarBio did not release Sargent from the lockup several months early, he still would have been able to sell his PixarBio shares within a short seven-month period. See 17 C.F.R. § 230.144(b)(1)(i) (2024) (using a one-year ownership benchmark as a proxy for insider status); see also Berckeley Inv.

- 16 -

Grp., Ltd. v. Colkitt, 455 F.3d 195, 213 (3d Cir. 2006) (noting that courts have otherwise "developed the general presumption that a two-year holding period is sufficient to negate the inference that the security holder did not take the securities with a view to distribute" (quotation marks and citation omitted)). This short holding period would preclude any reasonable jury from finding that Sargent did not purchase Persaud's shares with a view to distribution.

**2.**

Sargent next argues that he did not control Persaud at the time he purchased Persaud's shares. "Control" means "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405 (2024); see also SEC v. Kern, 425 F.3d 143, 149 (2d Cir. 2005) (acknowledging that section 4(a)(1) and its corresponding regulations do not define control but using § 230.405's definition of "control" because § 230.405 contains a definition of "affiliate identical to that of [section 4(a)(1)'s corresponding regulations]"). "Control" is typically "a question of fact" that turns on "the realities of the situation," SEC v. Int'l Chem. Dev. Corp., 469 F.2d 20, 28 (10th Cir. 1972), and "depends on the totality of the circumstances, including an appraisal of the influence the individual has on the management

and policies of a company [or person]," <u>SEC</u> v. <u>Cavanagh</u>, 1 F. Supp. 2d 337, 366 (S.D.N.Y. 1998), <u>aff'd</u>, 155 F.3d 129 (2d Cir. 1998). Notwithstanding the fact-intensive nature of this inquiry, at least two courts of appeals have held that courts can properly resolve this issue at the summary-judgment stage. <u>See</u> <u>Kern</u>, 425 F.3d at 147, 150; <u>SEC</u> v. <u>Sierra Brokerage Servs., Inc.</u>, 712 F.3d 321, 323, 329-30 (6th Cir. 2013).

In arguing that a jury could find that he did not control Persaud, Sargent claims that Persaud purchased his BMP shares as an investment; knew he could sell his shares on the public market and instead decided to sell them to Sargent; and negotiated with Sargent of his own free will, devoid of Sargent's influence. But Persaud's testimony, viewed as a whole and construed in Sargent's favor, falls well short of supporting Sargent's account of Persaud's knowledge about his "investment." Persaud testified that he did not know whether BMP sold products or provided services, and never had any conversation with Sargent about BMP's business or Sargent's plans for the future. Persaud paid $50 for his shares, a price that Sargent suggested, simply because Sargent "wanted to form an entity, and he needed a certain number of investors, and he [asked] me to be a participant." In other words, Persaud wanted "[t]o help a colleague" reach his goal.

Persaud's testimony also contradicts Sargent's claim that Persaud knew he could sell his shares on the public market.

Persaud of course anticipated selling the shares "at some point." But even accepting Sargent's view that Persaud expected to one day sell them on the public market, Persaud admitted that he never knew whether he could actually do so. He also testified that he did not know how to sell the shares; indeed, he never tried to do so until Sargent told him it was time to sell the shares back to Sargent. We therefore find Sargent's claim that Persaud knew he could sell his BMP shares on the OTC market unsupported by the record.

Finally, as to his sale of shares back to Sargent, Persaud stated that he had never heard of PixarBio and never discussed with Sargent anything about a potential merger or what his BMP shares might be worth. Rather, Sargent presented him with a check for $1,500 for Persaud's 18,000 shares,[7] and Persaud responded that "this is just a[] guess, [but] I think [the shares are] worth more than that." While testifying, Persaud explained that he had "[n]o reason" to think the shares were actually worth more but negotiated as "[j]ust a ploy to get a few dollars more." Accordingly, Sargent agreed on the spot to pay him $2,000 for the shares.

_____

[7] By this point, Persaud owned not only the shares he purchased from Sargent but also the shares of three other S-1 shareholders.

Sargent and the dissent both make much of the fact that Persaud "negotiated" the sale price, and in that manner demonstrated that his sale to Sargent was an arms-length transaction. We disagree. As the SEC highlights, the context is key here. See Cavanagh, 1 F. Supp. 2d at 366 (stating that control "depends on the totality of the circumstances"). After Persaud's initial purchase, and unbeknownst to Persaud, Sargent used his control of BMP to take two steps that bore directly on the value of the S-1 shares. First, he made the shares marketable to the public at large; and second, he negotiated a deal that made sense only if he could ensure that the bulk of the S-1 shares would be conveyed back to him or his designee for payments that would be less than the value the shares would have in effecting the deal he had in mind. By keeping the S-1 shareholders in the dark concerning these machinations, Sargent ensured they had no choice but to trust him when called upon to return their shares. Cf. Kern, 425 F.3d at 150 (finding control "where, as here, the controlling persons so dominated those controlled as to be able to gain upwards of 90% of the stock from Owners who were in a relationship of trust with Sellers"). As the SEC argues, this overarching scheme demonstrates that Sargent overwhelmingly possessed "the power to direct or cause the direction of the [S-1 shareholders'] management and policies of" their shares. See 17 C.F.R. § 230.405 (2024).

Indeed, Sargent's plans for a deal with PixarBio were, as a practical matter, contingent on the S-1 shareholders not inquiring as to his plans for the shares that had been effectively parked with them. And, thanks to Persaud's testimony in this case, we know that Sargent was right to expect Persaud's willingness to go along with the deal. That Persaud may have thought he was engaged in any material negotiation by getting an extra $500 simply highlights the disparity in knowledge that allowed Sargent to call the shots. And though Persaud did make an offhand effort to haggle, he had no choice but to trust that Sargent was treating him fairly in dictating the timing of the sale and the ballpark of the price. Thus, viewed as a whole, we think that any reasonable jury would understand Persaud's testimony to provide an insufficient basis for concluding that Sargent lacked "the power to direct" Persaud's handling of the S-1 shares. See id.

To support a finding of control, the SEC also urges reliance on a price disparity, measured by the difference between what Sargent paid Persaud for the shares and the consideration Sargent received from PixarBio in the August 19 stock-purchase agreement, which the SEC claims was payment for Sargent's facilitation of the transfer of S-1 shares to Herod and Giordano. Sargent, in turn, contests the SEC's reliance on the stock-purchase agreement, arguing that "he earned nothing at all" for his facilitation of the transfer of those shares. We need not take a

position on this dispute, however, where our holding rests on a finding of control independent from any price disparity.

To be sure, we recognize that Kern and Sierra relied on substantial price disparities in reaching their affirmances. See Kern, 425 F.3d at 150 ("The proof of control over Owners here rests in the ability of Sellers to garner overwhelming proportions of Citron and Polus' stock at a fraction of the price at which it was sold to Lybrand for distribution."); Sierra, 712 F.3d at 329 ("[T]he $250,000 Tsai received motivated his transfer of the thirty-three shareholders' stock . . . [, but] $250,000 is significantly higher than the low price of $3,300 that the thirty-three shareholders received when Tsai transferred [those same] shares. That differential demonstrates Tsai's control."). But we view these price disparities as one means among others of showing that one side was in the dark with regards to the essence of the transaction and therefore dependent on the other party. In other words, we understand our sister circuits in Kern and Sierra to have recognized the utility of a price disparity as an objective stand-in for actual evidence of control. Here, we have such evidence. And, as such, we need not opine on the presence or lack of a price disparity. Cf. Kern, 425 F.3d at 150 n.3 ("We do not intimate that such overwhelming proof of control exercised here is necessary to satisfy the broad definition of 'control[.]'").

None of this is to say that superior knowledge of any type concerning a transaction equates with control, or that a trust relationship by itself suffices. Here, though, Sargent ensured that his trusting colleague did not know the shares were even marketable, or that Sargent was orchestrating a pending transaction that he clearly thought would render the shares more valuable, but that would work only if he could acquire the S-1 shares. On this record, no properly instructed jury could find that Sargent did not effectively "possess[], direct[ly] or indirect[ly] . . . the power to direct or cause the direction of the management" of Persaud's S-1 shares. 17 C.F.R. § 230.405 (2024).[8]

**3.**

Sargent next argues that he no longer controlled BMP when he purchased Persaud's shares. Specifically, Sargent claims that because he had already resigned from all his controlling positions at BMP, he no longer controlled BMP, so Persaud and BMP

---

[8] For similar reasons, a case could also be made for affirming on the alternative ground that even if Sargent did not control Persaud, he undoubtedly controlled S-1 shareholder Thomas Saunders, who frankly admitted to being a "friendly investor[]" and to "waiting for" Sargent to tell him "what the plan was" regarding selling his shares. But because the district court limited its finding of a section 5 violation and its disgorgement remedy to Sargent's personal sales of PixarBio shares, see supra n.5, and Saunders's shares were purchased by Herod and Giordano, Sargent's purchase of shares from Persaud provides a cleaner path to affirmance.

were no longer under Sargent's "common control." See 15 U.S.C. § 77b(11); see also 17 C.F.R. § 230.144(a)(1) (2024) (setting out criteria for a safe harbor under which certain "affiliates," or "person[s] that . . . control[], or . . . [are] under common control with . . . [the] issuer," qualify for a section 4(a)(1) exemption[9]). However, Sargent never raised this argument below, so he forfeited it, and he makes no plain-error showing on appeal. See Universitas Educ., LLC, 98 F.4th at 373.

Even had he preserved the argument, it would likely have failed. "[A] person who [controls the issuer] during the negotiation of, and agreement to, the deal may not enjoy a [s]ection [4(a)(1)] exemption by simply abdicating [such control] (e.g., by selling his controlling shares or resigning as an officer or director) shortly before the parties complete the transaction." SEC v. Cavanagh, 445 F.3d 105, 114-15 (2d Cir. 2006) (italicization omitted). And here, there can be little serious doubt that Sargent "controlled" BMP at least until August 19, 2016, when PixarBio purchased Sargent's control block of BMP shares. And he remained on BMP's board of directors until September 15, only fifteen days before he retrieved the S-1 shares from Persaud. As the Second Circuit noted in Kern, "attempting to garner large quantities of [a] closely held compan[y's] stock in anticipation of public

_____

[9] Sargent does not otherwise meet the requirements for the Rule 144 safe harbor. See 17 C.F.R. § 230.144 (2024).

distribution . . . is exactly the type of transaction for which the Act was intended to require disclosure."  425 F.3d at 150; see also 17 C.F.R. § 230.144 preliminary note (2024) (stating that its "safe harbor is not available to any person with respect to any transaction or series of transactions that, although in technical compliance with [section 4(a)(1)'s corresponding regulations], is part of a plan or scheme to evade the registration requirements of the Act").

In sum, in purchasing the S-1 shares from Persaud that Sargent went on to resell to the public, Sargent clearly acquired the shares with a view to distribution, under the Act's definition of underwriter, and from an "issuer" (i.e., someone who, along with BMP, was under Sargent's common control).  Sargent thus cannot enjoy section 4(a)(1)'s protection for certain unregistered sales of securities.  In so finding, we note that section 4(a)(1) is "an exemption for ordinary transactions by ordinary, nonprofessional investors."  Thomas Lee Hazen, Treatise on the Law of Securities Regulation, § 4:94 (May 2024 Update).  We think Sargent's sale of S-1 shares, acquired from Persaud, was no ordinary transaction -- and that, even construing the record in Sargent's favor, it was exactly the type of transaction that the Act's registration requirements are designed to reach.  See SEC v. Ralston Purina Co., 346 U.S. 119, 124 (1953) ("The design of the

[Act] is to protect investors by promoting full disclosure of information thought necessary to informed investment decisions.").

Accordingly, we affirm the district court's grant of partial summary judgment to the SEC on its section 5 claim against Sargent.

### III.

We turn next to the appeal and cross-appeal arising from the district court's judgment ordering certain remedies for Sargent's section 5 violation. As relevant here, the district court imposed two equitable remedies that Sargent now argues were abuse of discretion. First, the court issued a two-part injunction, permanently enjoining Sargent from violating section 5, and enjoining him for ten years from participating in penny-stock offerings. Second, the court ordered that Sargent be held liable for disgorgement in the amount of $562,786 plus $142,132 in prejudgment interest. Meanwhile, the district court declared itself barred from imposing, in addition to equitable remedies, a civil penalty for Sargent's section 5 violation -- a finding that the SEC, for its part, argues was abuse of discretion. We address these three issues seriatim.

### A.

In order to prevent future violations of the securities laws, the Act permits the SEC to seek an injunction against a person "[w]henever it shall appear to the [SEC] that [the] person

is engaged or about to engage in any acts or practices which constitute or will constitute a violation of" the Act. 15 U.S.C. § 77t(b). The Act also provides that in any proceeding "against any person participating in, or, at the time of the alleged misconduct, who was participating in, an offering of penny stock, the court may prohibit that person from participating in an offering of penny stock, conditionally or unconditionally, and permanently or [temporarily]." Id. § 77t(g)(1).

"The legal standard for issuance of [an] injunction is a 'reasonable likelihood of recidivism,' which is assessed by looking at 'several factors, none of which is determinative.'" SEC v. Lemelson, 57 F.4th 17, 30 (1st Cir. 2023) (quoting SEC v. Sargent, 329 F.3d 34, 39 (1st Cir. 2003)). These factors include "(1) the nature of the violation, including its egregiousness and its isolated or repeated nature, (2) whether the defendants will, owing to their occupation, be in a position to violate again, and (3) whether the defendants have recognized the wrongfulness of their conduct." Id. (quotation marks omitted) (quoting Sargent, 329 F.3d at 39). In deciding whether to impose a penny-stock bar, courts typically also consider the defendant's repeat-offender status, the defendant's role in the offense, the defendant's degree of scienter, and the defendant's economic stake in the violation. See SEC v. Weed, 315 F. Supp. 3d 667, 677 (D. Mass 2018) (citing SEC v. Patel, 61 F.3d 137, 141 (2d Cir. 1995)).

"In an SEC enforcement action, we review the district court's decision to enter an injunction for abuse of discretion." Lemelson, 57 F.4th at 30. Abuse of discretion "occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the [district] court makes a serious mistake in weighing them." Sargent, 329 F.3d at 38 (quoting Indep. Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co., 864 F.2d 927, 929 (1st Cir. 1988)). It also occurs when the district court "incorrectly applies the law to particular facts." Id. (quoting Am. Bd. of Psychiatry & Neurology, Inc. v. Johnson-Powell, 129 F.3d 1, 3 (1st Cir. 1997)).

Here, we simply cannot glean from the district court's cryptic remedial order any consideration of the factors relevant to issuing an injunction. It is true that "[t]here are no magic words that a district court must pronounce in order to convince [us] that it has considered an issue" and "[a] simple reference normally will do." In re Grand Jury Investigation, 545 F.3d 21, 26 (1st Cir. 2008). And we have previously found that a district court acts within its discretion even when it does not make detailed findings as to the application of the legal standard, if it at least "properly articulate[s] the legal standard." See Sargent, 329 F.3d at 39. But here, the district court's order did not recite any legal standard at all. Nor did it offer any

- 28 -

explanation from which one could confidently infer application of the correct standard.

In briefing the issue below, the parties both cited the relevant factors, while disagreeing as to their relative weight and application. But the district court never made any finding as to Sargent's likelihood of recidivism (or any subsidiary factor) to which we can point to sustain the injunction.[10] Nor is the proper application of the factors obvious from the record: Sargent has not been convicted of a crime or been found to have committed a civil violation that has scienter as an element. Nor is he a repeat offender. So it is difficult to infer from the merits judgment the district court's rationale for the injunction. Rather than guessing, we vacate the injunction on Sargent -- both the penny-stock bar and the ban on future section 5 violations -- and remand to give the district court an opportunity to consider afresh the injunction and explain its rationale.

**B.**

Sargent next takes issue with the district court's disgorgement order. The district court found Sargent liable for disgorgement of $562,786, "representing a portion of net profits

_____

[10] The SEC does not argue that distinct standards apply to the validity of the court's imposition of a penny-stock bar as opposed to its permanent injunction on Sargent from future section 5 violations. As a result, we assume the general "reasonable likelihood of recidivism" standard applies to both forms of injunctive relief.

gained as a result of" Sargent's conduct in violation of section 5, plus $142,132 in prejudgment interest. In calculating the disgorgement amount, the district court declined to discount the taxes Sargent paid on the income to be disgorged. On appeal, Sargent argues that the district court's refusal to do so was abuse of discretion. We disagree.

In Liu v. SEC, the Supreme Court held that "[c]ourts may not enter disgorgement awards that exceed the gains made upon any business or investment, when both the receipts and payments are taken into the account." 591 U.S. 71, 91 (2020) (quotation marks and citation omitted). "Accordingly, courts must deduct legitimate expenses before ordering disgorgement . . . ." Id. at 91-92. In so holding, the Court reiterated "the general rule that a defendant is entitled to a deduction for all marginal costs incurred in producing the revenues that are subject to disgorgement." Id. at 91 (citing Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. h (Am. L. Inst. 2010)).

Here, Sargent argues that the taxes he paid on the income to be disgorged, i.e., the capital gains taxes on Sargent's unregistered sales of PixarBio stock, were a legitimate expense that did not figure into his net profits to be disgorged. He argues that net profits, as distinct from gross profits, encompass "[t]otal sales revenue less the cost of the goods sold and all

additional expenses," including taxes.  Profit, Black's Law Dictionary (11th ed. 2019).

However, the capital gains tax Sargent paid on his unregistered sale of PixarBio shares was not a "legitimate expense[]" because it was not a cost "incurred in producing the revenues that are subject to disgorgement." Liu, 591 U.S. at 91. Rather, the tax was a post hoc consequence of his sale of the shares at a particular price, one that would have occurred regardless of whether those sales were properly registered under section 5.

Moreover, the Restatement also explains -- in the same comment that Liu cited -- that a "defendant is normally denied a credit for income taxes paid . . . to avoid a distortion resulting from the effect of the judgment on the defendant's future tax liability."  Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. h (Am. L. Inst. 2010).  That is exactly what happened here:  The district court explained that it declined to subtract the taxes because Sargent might subsequently request that the Internal Revenue Service (and/or the Connecticut tax authorities) recalculate his taxes to reflect that his income had been disgorged.  In any event, Sargent does not dispute this finding on appeal, so he has waived any challenge to this portion of the district court's rationale.  United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

Consequently, we find that the district court did not abuse its discretion in calculating the disgorgement award.

## C.

The district court declined to impose a civil penalty on Sargent for his section 5 violation. It reasoned that, because the SEC's separate fraud claims were set for a jury retrial, the court was prohibited from imposing a penalty. Specifically, it explained that the "[i]mposition of a penalty is a quintessentially legal remedy," and that "[i]n a jury case, absent a jury verdict or a ruling that obviates the need for a jury, it is beyond the constitutional power of this [c]ourt to impose a penalty." Moreover, even after the district court later dismissed the SEC's fraud claims (as discussed further at infra Part IV), it still determined that it lacked "power to award a penalty" where Sargent's right to a jury trial "ha[d] been asserted and not waived." The SEC now cross-appeals, arguing that the district court erred as a matter of law in holding itself barred from awarding a civil penalty, rendering its failure to do so abuse of discretion. We agree.

Put simply, the district court's grant of partial summary judgment to the SEC on its section 5 claim was precisely the "ruling that obviate[d] the need for a jury" on that claim. It is well established that "summary judgment does not violate the Seventh Amendment." Parklane Hosiery Co. v. Shore, 439 U.S. 322,

336 (1979). Courts thus regularly impose civil penalties in cases resolved at summary judgment, including for section 5 violations. See, e.g., Kern, 425 F.3d at 145.

To be sure, "where equitable and legal claims are joined in the same action, there is a right to jury trial on the legal claims which must not be infringed . . . by a court trial of a common issue existing between the claims." Ross v. Bernhard, 396 U.S. 531, 537-38 (1970). "Thus, where there are issues common to both the equitable and legal claims, the legal claims involved in the action must be determined prior to any final court determination of [the] equitable claims." Danjaq LLC v. Sony Corp., 263 F.3d 942, 962 (9th Cir. 2001) (quotation marks and citation omitted).

However, if "the legal and equitable claims do not involve common issues," then no constitutional problem arises. Granite State Ins. Co. v. Smart Modular Techs., Inc., 76 F.3d 1023, 1027 (9th Cir. 1996). And here, the district court held that there was no triable issue of fact as to Sargent's section 5 liability. See Sargent, 589 F. Supp. 3d at 206. The court could thus grant the SEC's request to impose a civil penalty based only on a finding of (1) Sargent's section 5 liability and (2) his gross pecuniary gain. See 15 U.S.C. § 77t(d)(1)-(2). Neither the existence of a section 5 violation nor Sargent's resulting gain were elements of the SEC's fraud claims against Sargent. See id. §§ 77q(a), 78j(b).

And in seeking a civil penalty, the SEC relied only on the section 5 claim. Accordingly, the district court could have deemed a first-tier civil penalty appropriate without conflicting with any subsequent findings a jury would be required to make in its determination of Sargent's liability for those fraud claims.

Thus, we conclude that the district court erred in holding itself prohibited from awarding a civil penalty and therefore abused its discretion in refusing to do so on that basis. In so ruling, we express no view on whether Sargent's conduct warrants a penalty.

**IV.**

We last turn to the SEC's cross-appeal of the district court's dismissal of its fraud claims against Sargent.

**A.**

Recall that on July 12, 2023, when the district court ordered equitable remedies for Sargent's section 5 violation, the court ordered that its judgment not enter until "appropriate" -- that is, until the resolution of the SEC's separate fraud claims that were set for retrial that September. And as discussed, in that order, the district court erroneously concluded that it lacked authority to issue a civil penalty on the section 5 claim "absent a jury verdict or a ruling that obviates the need for a jury."

A few weeks prior to issuing that order, the district court convened a status conference to explain its tentative disposition. First, the court indicated that it would likely not grant any civil penalty so long as there remained an outstanding jury trial on the fraud claims. In response, the SEC stressed that "the relief that would be granted on the [s]ection 5 claim [was] material to the [SEC's] decision whether to try to prove for a second time to a jury that Henry Sargent committed securities fraud." In other words, the SEC explained, it was "very difficult to make an informed decision" about whether to retry its fraud claims "without knowing whether or not the relief that [the SEC sought] on the [s]ection 5 claim would be implemented." In turn, the district court noted that it was "not going to tell [the SEC] flat out" that it would not "give a penalty," but it indicated that it was "inclined not to do [so]."

After the court went on to issue its July 12 nonfinal remedial order, the SEC filed a notice stating that the order granted "substantially all of the equitable relief sought by the [SEC] following the jury verdict against Sargent." The SEC argued -- as it had previously -- that the court was wrong to hold itself barred from issuing a civil penalty based on the pending retrial of the separate fraud claims. However, the SEC explained, in light of the comprehensive nature of the relief outlined in the nonfinal order, the SEC would seek internal authorization to "file

- 35 -

a motion to dismiss the remaining [fraud] claims upon entry of a final order granting all equitable relief set forth in the July 12, 2023 [o]rder and any civil penalty the [c]ourt deems appropriate." In the SEC's view, "[u]pon the granting of such motion, no jury claims would remain, obviating the need for a retrial." And "[i]f no jury claims remained, the [c]ourt could consider the entirety of the record to fashion an appropriate penalty."

The SEC then filed a "Motion for Entry of Order Concurrently Granting Certain Relief and Dismissing Fraud Claims." In that motion, the SEC requested that the district court

> enter an order or orders that concurrently:
> (1) provide all of the relief set forth above and in the [c]ourt's July 12, 2023 [o]rder;
> (2) impose a civil penalty of $630,979 or, if needed, set a hearing regarding imposition of a civil penalty as soon as is practicable; and
> (3) dismiss the [SEC's fraud claims against Sargent].

Sargent filed a response to the SEC's motion. He did not oppose the SEC's request to dismiss its fraud claims but argued that dismissal should be granted with prejudice. Sargent also opposed the entry of any civil penalty.

Around two weeks later, in response to the SEC's motion and Sargent's response, the district court issued a minute order (1) entering its July 12 nonfinal order outlining equitable remedies on the section 5 claim as the final judgment in the case, (2) dismissing the SEC's remaining fraud claims with prejudice,

and (3) declining to order any civil penalty on the ground that the court "has no power to award a penalty . . . where a jury claim has been asserted and not waived."

**B.**

The SEC now appeals, arguing that the district court abused its discretion in "sua sponte" dismissing its fraud claims "without assessing whether civil penalties were appropriate." But given our conclusion that the district court erred in holding itself prohibited from issuing a civil penalty, on remand "assessing whether civil penalties [are] appropriate" is precisely what the district court must do. As the SEC shall now have an opportunity to argue for a civil penalty, to also reinstate its fraud claims would let the SEC have its cake and eat it too. In other words, on remand, the court will proceed unrestrained by any suggestion that it lacks the ability to assess on the merits whether civil penalties for the section 5 violation are appropriate. And with the court so empowered, we lack a basis for revisiting the district court's acceptance of the SEC's invitation to dismiss the fraud claims.

**V.**

For the foregoing reasons, we <u>affirm</u> the district court's grant of partial summary judgment to the SEC on its section 5 claim. We also <u>affirm</u> the district court's calculation of disgorgement, as well as its dismissal of the SEC's fraud

claims.  However, we otherwise <u>vacate</u> the district court's remedial order, including its injunction against Sargent, and <u>remand</u> for proceedings consistent with this opinion.  On remand, the district court shall, among other things, assess the appropriateness of injunctive relief and civil penalties for Sargent's section 5 violation.  Nothing in this opinion shall be read as favoring or disfavoring such relief or penalties. No costs are awarded.

**- Concurring and Dissenting Opinion Follows -**

**BARRON**, <u>Chief Judge</u>, concurring in part and dissenting in part. The majority affirms the grant of summary judgment to the Securities Exchange Commission ("SEC") on its claim that Henry Sargent violated Section 5 of the Securities Act of 1933 ("Act"). The SEC alleges in the claim that Sargent committed the violation by selling shares of already issued stock as an "underwriter" without an accompanying registration statement, which would have disclosed important information about the shares to the investing public. 15 U.S.C. §§ 77d(a)(1), 77b(a)(11).

Ordinarily, the Act exempts a sale, like Sargent's, of already issued securities from Section 5, even though the Act does not exempt the issuance itself. <u>See</u> 15 U.S.C. §§ 77e, 77d(a)(1). However, the Act treats a post-issuance sale as a covered intermediate step in the issuing company's own process of distributing its securities when the sale is made by an "underwriter," because of an underwriter's relationship to both the issuing company and the securities involved in the sale. <u>See</u> <u>SEC</u> v. <u>Murphy</u>, 626 F.2d 633, 648 (9th Cir. 1980); <u>SEC</u> v. <u>M&A West, Inc.</u>, 538 F.3d 1043, 1053 (9th Cir. 2008).

The summary judgment ruling here must stand, therefore, if the record establishes beyond reasonable dispute that Sargent was acting as an underwriter when he sold the securities in question, as Sargent concedes that no registration statement accompanied their sale. In my view, however, the record is not

clear enough to establish that Sargent was acting as an underwriter at the time of the sale of the shares in question. I thus join only in the portions of the majority's opinion that do not concern the SEC's Section 5 claim against Sargent.

## I.

The following uncontradicted facts bear on Sargent's underwriter status in making the sale alleged to have violated Section 5. From November 2016 to January 2017, he sold nearly 110,000 publicly tradable shares of stock in a putative biotechnology company, PixarBio Corp ("PixarBio"). The shares had been issued and registered as S-1 shares by a fledgling company -- a yoga business known as BMP Holdings, LLC ("BMP") -- that Sargent himself had created and operated as a side venture to his regular job.

The shares became PixarBio shares only after that company consummated a reverse merger with BMP, which occurred not long after Sargent founded the company. The reverse merger followed a stock-purchase agreement between Sargent and PixarBio, which at the time was looking for a shell company with which to merge.

The agreement's formal terms required Sargent, in return for a very substantial sum, to take the following actions: (1) transfer his five million restricted shares in BMP to PixarBio; (2) resign as BMP's sole director and appoint a designee of

PixarBio as director; (3) cause the resignation of all of BMP's officers; and (4) secure lock-up agreements with other outstanding BMP shareholders holding 25,000 S-1 shares in BMP.[11] The stock-purchase agreement mentioned no other BMP shares. At the time that Sargent fulfilled his duties under this agreement, however, he also transferred 140,000 S-1 BMP shares, over which he had blank stock powers, to two PixarBio associates.

After carrying out the terms of the stock-purchase agreement, Sargent still retained some S-1 shares in BMP. In particular, he retained 18,000 such shares that, after having sold them for a trifle two years earlier to one of his colleagues, Bhodnarine Persaud, he had bought back from that colleague not long after he had fulfilled the promises that he had made to PixarBio in the stock-purchase agreement.

Sargent bought back those shares before the reverse merger between PixarBio and BMP took effect. Persaud did not know, at the time of that transaction, about Sargent's stock-purchase agreement with PixarBio, the expected reverse merger between that company and BMP, or even, arguably, whether the shares that he was selling to Sargent were publicly tradable. Nonetheless, Persaud rejected Sargent's initial offer to buy the shares for $1,500 and

---

[11] The contract also required Sargent to deliver certain codes for SEC filings as well as BMP's books and records.

only agreed to sell them to Sargent after Sargent agreed to Persaud's counteroffer of $2,000.

Following the reverse merger between PixarBio and BMP, Sargent then sold on the open market as PixarBio shares a portion of the 18,000 S-1 shares in BMP that he had acquired from Persaud.[12] By that time, however, members of PixarBio's management team -- unbeknownst to Sargent, as far as the record shows -- had executed a pump-and-dump scheme to inflate the newly merged company's stock price. As a result, Sargent netted $627,979 when he ultimately sold the PixarBio shares to the public -- reaping a per-share value 500 times greater than Persaud got per share in his deal with Sargent.

## II.

If all this wheeling and dealing raises questions about whether Sargent was acting as an underwriter when he sold the PixarBio shares on the open market for more than $600,000, I can see why. But, remember, we are considering an appeal from a grant

---

[12] Sargent sold approximately 110,000 PixarBio shares on the public market from November 2, 2016 to January 23, 2017. At the time public trading of PixarBio shares began, Sargent owned 280,000 PixarBio shares. Of the 280,000, 180,000 were the 18,000 S-1 shares in BMP Sargent had acquired from Persaud, which multiplied by 10 after PixarBio caused BMP to declare a 9 for 1 stock dividend and later became PixarBio shares as a result of the reverse merger. The remaining 100,000 were the 10,000 S-1 shares in BMP he had acquired from his sister a month prior to his transaction with Persaud, which also multiplied by 10 and became PixarBio shares for the same reasons as above.

of summary judgment to the SEC that is based on Sargent having been an "underwriter" in making the sale of just a portion of those shares. The question for us is therefore a narrow one: Is it beyond reasonable dispute that Sargent was acting as an underwriter with respect to his sale of any of the specific S-1 shares in BMP that he had bought back from Persaud?[13]

In fact, though, the question that we must decide is even narrower still. For example, although a seller of securities who purchases them with a view to their distribution from someone who directly controls or is directly controlled by the company that issued them qualifies as an underwriter, see 15 U.S.C. § 77b(a)(11), there is no contention that Sargent was acting as a seller like that in selling the securities that are of concern. Rather, the majority, like the SEC, is of the view that it is beyond reasonable dispute that Sargent qualified as an underwriter at the relevant time, because, in selling the securities in

---

[13] The SEC urges an alternative ground for affirming the grant of summary judgment: it contends that the record clearly shows that Sargent violated Section 5 by facilitating the PixarBio associates' resale of the non-Persaud S-1 shares on the open market -- which was itself not registered -- by helping transfer those shares to them using blank stock powers. See SEC v. Sierra Brokerage Servs., Inc., 712 F.3d 321, 328 (6th Cir. 2013) ("A party can violate the registration requirements . . . through even indirect involvement in the public sale of unregistered securities."). But we cannot affirm the grant of summary judgment to the SEC on the Section 5 claim on that basis because the only shares that ground the claim that yielded the ultimate disgorgement award here are the Persaud shares that Sargent himself sold on the open market.

question, he exercised "common control" over both the company that issued them (BMP) and the party from whom he acquired them (Persaud) with a view to their distribution.  Id.

Moreover, the majority concludes that, by putting forth evidence that supportably shows that Sargent sold unregistered securities when he sold the PixarBio shares in question on the open market, the SEC has established a prima facie case that Sargent violated Section 5 in selling the Persaud shares.  The majority thus concludes -- and I agree -- that the SEC thereby has shifted the burden back to Sargent to identify a triable issue of fact about his underwriter status.  See SEC v. GenAudio Inc., 32 F.4th 902, 941 (10th Cir. 2022).  And, further, the majority concludes, and I agree, Sargent has not identified a genuine issue of material fact as to either whether he exercised the requisite control over BMP itself at the time of the deal with Persaud or whether he acquired the S-1 shares in BMP in that deal with a view to their distribution.

Thus, I agree with the majority that the question on which Sargent's challenge hinges concerns only whether he has shown that there is a supportable basis for finding that he did not exercise control over Persaud when he bought the 18,000 S-1 shares in BMP from him.  For, given the ways the burdens of proof are allocated, only if Sargent has made that showing would there then be a genuine issue of material fact for a jury to decide as to

whether he was exercising the kind of "common control" over the shares in question that would have made him an underwriter in subsequently selling any of them to the public.

So, has Sargent shown what he must with respect to whether he controlled Persaud in buying back the 18,000 S-1 shares in BMP? Sargent contends that he has through the testimony that he put forward from Persaud, as Persaud states in that testimony that he negotiated the price that Sargent paid him for those shares and ultimately received more for them than Sargent had initially offered.

All else being equal, I agree with Sargent that it would be reasonable for a juror to find that he has made the requisite showing about his lack of control over Persaud based on this testimony. Standing on its own, the testimony does supportably show that the seller here (Persaud) exercised independent judgment in successfully bargaining for an advantageous price from the buyer (Sargent), as it is reasonable to find, absent any other evidence, that a person who sells something for more than the purchaser first offered is not under the purchaser's thumb.

In fact, the majority does not appear to disagree. It contends, however, that there is other evidence in the record that, when taken together, precludes a reasonable juror from relying on Persaud's testimony to find that Sargent has shown that he did not

control Persaud at the critical time.  For reasons that I will next explain, I am not persuaded.

## III.

The majority concludes that, as a matter of law, a purchaser of securities controls the seller if nothing in the record suffices to put in reasonable dispute evidence that otherwise shows that the purchaser "possess[ed], direct[ly] or indirect[ly], . . . the power to direct or cause the direction of [the seller's] management" of those securities.  This conclusion rests on the SEC regulation that defines "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 230.405 (2024).

The majority then holds that, notwithstanding the testimony from Persaud about his successful counteroffer to Sargent, the SEC has conclusively shown that Sargent "possess[ed], direct[ly] or indirect[ly], . . . the power to direct or cause the direction of [Persaud]'s management" of his S-1 shares.  To support this holding as an evidentiary matter, the majority points to the undisputed evidence conclusively showing that Persaud and Sargent were colleagues, that Persaud purchased the shares in question upon Sargent's request for a price that Sargent specified, that Sargent subsequently entered into a deal with PixarBio that would

make sense only if Sargent could reacquire a large bulk of S-1 shares, that Sargent possessed vastly more knowledge than Persaud about BMP and the value of its shares, and that Persaud then sold the shares back to Sargent.  The majority also reads the record to establish -- beyond reasonable dispute -- that Persaud never knew that he could sell the shares on the public market.

I assume that the majority is right that the record does establish conclusively that, notwithstanding Sargent's assertion to the contrary, Persaud did not understand himself to be acquiring the shares from Sargent as an investment.  What matters, though, is whether Sargent controlled Persaud in their later transaction in which Persaud sold those shares back to Sargent, not whether Sargent controlled Persaud when he first handed those shares over to Persaud.

Similarly, the majority may be right that the stock-purchase agreement between Sargent and PixarBio shows beyond reasonable dispute that Sargent was betting on being able to buy back Persaud's S-1 shares when he entered into the stock-purchase agreement with PixarBio.  But what matters is whether Sargent in fact possessed control over Persaud in re-acquiring those shares, not whether Sargent wished to exercise such control in theory when he entered into that agreement.

Thus, notwithstanding the majority's reasons for discounting Persaud's testimony, it would appear to me to be of

some import to the question of Sargent's power over Persaud with respect to the shares in question that Persaud testified that, in fact, he got Sargent to pay more for those shares than Sargent first offered for them. After all, the question for us on appeal is not whether it would be reasonable to find on this record that Sargent possessed "the power to direct" Persaud's management of his S-1 shares but whether it would be unreasonable to find otherwise. And while it is always tempting to conclude that one's reading of the record is the only reasonable reading available, it is a temptation to be resisted.

In fact, there is an especially strong reason to resist that temptation here, because the District Court did not rely on the evidence that the majority invokes to support its ruling, nor did the SEC in making its case for summary judgment to the District Court.

Thus, the majority breaks new ground in concluding that the features of the record that it concludes make all the difference make that difference. As a result, that conclusion must be "made manifest by the record" for it to provide a permissible basis for our affirming the ruling below. Perez v. Volvo Car Corp., 247 F.3d 303, 310 (1st Cir. 2001).

In other words, it must be manifest in the record that, because of all the evidence the majority foregrounds about the relationship between Sargent and Persaud and what each knew, no

reasonable juror could find that Persaud was acting independently of Sargent in successfully wringing an extra $500 out of him in their dealings. I agree that the features of the record to which the majority gives such weight might suffice if the record also made manifest that Persaud, despite his push-back on price, indisputably managed only to get less than -- or even, potentially, just -- fair market value for the shares in question in selling them back to Sargent. In that event, the evidence of Persaud's push-back, at least arguably, would do nothing to put in question the other evidence in the record of Sargent's "power to direct" Persaud's management of his shares. But the majority does not suggest -- let alone identify conclusive evidence showing -- that, despite getting Sargent to pay a third-more for the shares than he first offered for them, Persaud still ended up getting either less than or no more than he could have gotten by selling the shares on the open market or to anyone else.

As a result, I fail to see how the record manifestly shows that no reasonable juror could find that Sargent lacked the "power to direct" Persaud's management of his shares. Indeed, if anything, Sargent's willingness to accede to Persaud's push-back would appear to provide a supportable basis for finding that Persaud had leverage over Sargent rather than that Persaud was dependent on him.

Notably, the only circuit precedent on which the majority relies for its control ruling -- SEC v. Kern, 425 F.3d 143 (2d Cir. 2005) -- does not suggest otherwise. Kern did state that a "relationship of trust" is indicative of control. Id. at 150. But it ultimately held only that a purchaser's ability to acquire shares in bulk suffices to demonstrate control as a matter of law when the purchaser obtained the shares at "a fraction of the price at which" the purchaser ultimately sold them. Id. (emphasis added) ("The proof of control over [the shell company's shareholders] here rests in the ability of [the defendants] to garner overwhelming proportions of [the shell company's stock] at a fraction of the price at which it was sold.").

In fact, Kern did not even hold that the price-disparity-based ground for finding control would carry the day in a case that also had evidence of "haggl[ing]," Maj. Op. at 22, of the sort that the majority acknowledges Persaud's testimony provides here. Nor did Kern have any reason to do so. There was no evidence in that case that the allegedly controlled parties had managed, despite their claimed dependency, to get more for the shares than the allegedly controlling party had offered. Yet Kern still relied on a substantial price disparity to find control as a matter of law, 425 F.3d at 150, and quite understandably so, given that people involved in arms-length securities transactions

do not usually part with shares for a song that they could sell for a killing.

So, while the majority tries to justify our affirming the District Court's summary judgment ruling on a ground independent of there being any price disparity, I see no basis for our doing so on this record. I thus turn to the Kern-derived ground for finding conclusive evidence of control on which both the District Court and the SEC relied, which rests on the determination that the record indisputably establishes that Persaud sold his 18,000 S-1 shares in BMP to Sargent at a fraction of their price.

**IV.**

The District Court did find that there was a price disparity here comparable to the one in Kern. The District Court did so based on the evidence that Sargent paid Persaud only $2,000 for shares that Sargent ultimately sold a portion of in a sale that netted him $627,979.

Not even the SEC suggests on appeal, however, that under Kern -- and the follow-on Sixth Circuit precedent that drew upon it, SEC v. Sierra Brokerage Services, Inc., 712 F.3d 321 (6th Cir. 2013) -- this evidence of price disparity, massive as the disparity is, conclusively shows that Sargent controlled Persaud. The reason for the SEC's circumspection is easy enough to understand. The District Court itself found that -- unlike in either Kern or

Sierra -- this disparity resulted from an event that intervened between the purchase and the sale: the execution of the post-reverse-merger pump-and-dump scheme by members of PixarBio's management. As a result, the ultimate sale price for the Persaud shares that Sargent garnered on the open market provides no basis for finding that those shares were worth more than $2,000 when Persaud sold them to Sargent.

The SEC therefore directs our attention to a different deal to make the case that the record contains conclusive evidence of a control-cinching price disparity: the stock purchase agreement between Sargent and PixarBio that was consummated just prior to Sargent reacquiring the S-1 BMP shares from Persaud. The SEC reasons that this deal must be treated as showing that Sargent received $325,000 from PixarBio for his promise to transfer 140,000 S-1 shares in BMP to two PixarBio associates. The SEC thus reasons, albeit implicitly, that this deal conclusively shows that Sargent obtained $2.50 per S-1 share of BMP in his deal with PixarBio ($325,000 divided by 140,000 S-1 shares), which is an amount more than twenty times greater than the $0.11 Persaud obtained for each S-1 share of BMP in his deal with Sargent shortly thereafter ($2,000 divided by 18,000 S-1 shares). Hence, according to the SEC, the PixarBio deal conclusively establishes a price disparity that, under Kern and Sierra, dispositively shows that

Sargent controlled Persaud, notwithstanding Persaud's testimony regarding their negotiation over his S-1 shares in BMP.

Precisely because the District Court did not rely on this price disparity for its summary judgment ruling, however, we can affirm based on this alternative ground only if the claimed disparity in price is "made manifest by the record." Perez, 247 F.3d at 310. I agree with Sargent that it is not.

The stock-purchase agreement neither mentioned the S-1 BMP shares that Sargent transferred to PixarBio associates, nor clearly stated that PixarBio would pay Sargent $325,000. The agreement instead required PixarBio to pay $108,500 to Sargent and $216,500 to BMP, which would use $191,500 of that sum to satisfy its outstanding loan obligations to Sargent and the rest for certain company expenses. Further, the agreement expressly required Sargent to hand over his five million restricted BMP shares (which represented 97 percent of BMP's outstanding stock and which the SEC itself referred to in its complaint as the "controlling interest in BMP"), cause all BMP officers to resign (including himself), appoint a PixarBio designee to replace him as sole director of BMP, and secure lock-up agreements as to 25,000 outstanding S-1 BMP shares.

As a result, the SEC acknowledges, as it must, that if there is a genuine issue of material disputed fact about how much PixarBio was paying for any of the expressly enumerated parts of

the deal, then there is necessarily a genuine issue of material disputed fact about whether PixarBio was valuing each S-1 BMP share at $2.50 or something close to that amount. However, the SEC contends counterintuitively that there is no such issue because PixarBio clearly was paying the $325,000 only for the unmentioned S-1 shares that Sargent gave to two of its associates.

To support this surprising contention, the SEC asserts that the five million restricted shares "lacked any value to PixarBio." That is so, the SEC explains, because the record establishes without contradiction that they were not publicly tradable and that PixarBio eventually cancelled them.

I cannot agree that it is manifest in the record, however, that a reasonable juror would be compelled to find that PixarBio deemed the restricted shares worthless at the time of the stock-purchase deal itself, even accounting for PixarBio's post-merger cancellation of them. As Sargent points out, the value of a controlling block of restricted shares at that time does not speak to their value to a company seeking to make a merger happen. See 19 Am. Jur. 2d Corporations § 2234 (2024). Indeed, the record shows that PixarBio cancelled the shares a month after the reverse merger had been completed.

Moreover, the ability to effectuate a reverse merger is itself valuable. It enables shareholders of privately held companies not only to trade their shares in those companies on the

public market "without [the company's] undertaking the expensive process of an initial public offering," Sierra, 712 F.3d at 324, but also to do so without being subject to the registration requirements of Section 5 that would ordinarily apply to such a public offering, see 15 U.S.C. § 77d(a)(1).

As for the other parts of the stock-purchase agreement, the SEC inexplicably ignores them. Yet, it is reasonable to infer that Sargent's promise to install a PixarBio designee as the sole director of BMP in his stead was helpful to PixarBio's effectuation of the merger, because the board of directors enters into merger agreements on behalf of the corporation. See 19 Am. Jur. 2d Corporations § 1273 (2024). Similarly, it is hardly manifest in the record that PixarBio deemed worthless Sargent's promise to secure lock-up agreements on 25,000 S-1 shares, because such agreements protect the value of the stock from being diluted by a significant number of shares flooding the marketplace when public trading begins. See 24 William M. Prifti, Securities: Public and Private Offerings § 4:7 (2d ed. 2024).

In other words, even if a reasonable juror were to agree with the SEC that PixarBio was paying Sargent $325,000 for carrying out his end of the stock-purchase agreement and that the deal included Sargent's promise to transfer the 140,000 S-1 shares in BMP, I do not see why such a juror would have to find evidence of a price disparity that showed that Sargent controlled Persaud.

Such a juror still easily could find on this record that Sargent's willingness to offer up the other aspects of the exchange substantially contributed to PixarBio's willingness to pay that large sum. I thus cannot see how it is manifest in this record that such a juror would have to find that PixarBio paid Sargent around $2.50 for each S-1 share in BMP rather than some far lower price.[14]

But let's assume, favorably to the SEC, that the record does make manifest that PixarBio indisputably was valuing the 140,000 S-1 shares in BMP at $2.50 a share at the time of the stock-purchase agreement. The record even then would not make

_____

[14] Kern, like Sierra, did not address whether the allegedly controlling party who is buying shares, the allegedly controlled party who is selling them, or both such parties must know in engaging in the exchange that the shares are in fact being sold for far less than they are worth at that time in order for the disparity between that sale price and the later price for which they are sold to provide a dispositive basis for concluding that the buyer controlled the seller. See Kern, 425 F.3d at 150; Sierra, 712 F.3d at 329-30. In fact, Kern and Sierra leave open the possibility that the knowledge of the parties to the exchange that the shares are worth more than they are being sold for may be irrelevant to whether the disparity in price shows that the seller controlled the party, as it may be that under Kern and Sierra the control question is to be determined wholly by an objective assessment of what a reasonable party to the exchange would have understood about the value of the shares. I need not resolve that open question about the kind of knowledge that is required, however, because, for the reasons I have explained, the PixarBio deal fails to show that either Sargent or Persaud, let alone both, in fact knew or reasonably could have known that Persaud could get $2.50 a share for his S-1 shares in BMP as of the time of the subsequent exchange for those shares between Persaud and Sargent.

clear that any market participant would similarly value a standalone S-1 share in BMP.

At most, the record then would show that there was a single company that was willing to pay a $2.50 per share price to a holder of such shares who also had a controlling block in a shell company with which it wished to effect a reverse merger. Persaud, however, only had standalone S-1 BMP shares to give, not a controlling block in that company. Therefore, the PixarBio deal would not show that Persaud could have gotten more for his S-1 shares in BMP than he testified that he convinced Sargent to pay for them.

Indeed, the PixarBio associates who received the 140,000 S-1 shares in BMP from Sargent paid $0.02 per share for them. And although the record does show that the associates then sold the shares for a lot after the pump-and-dump scheme had been executed, our concern is with what Persaud could have gotten for them at the time that he sold them to Sargent.

I should also add that the deals that Kern and Sierra looked to as benchmarks for the control-determining price disparities that they found were not like the assertedly benchmarking deal here. Kern involved a sale of shares in the open market, Kern, 425 F.3d at 146, which was plainly a market equally available to the supposedly controlled seller there. So,

- 57 -

the price of the sale there did show what someone with those shares could get for them.

True, Sierra is somewhat more on point, as it anchored the dispositive price disparity in a private deal involving a shell company.  712 F.3d at 329.  But the disparity there at least was traced to a sale that was solely of the shares in question, id. at 326, thereby arguably making it reasonable to infer that there was a party -- the buyer in that transaction -- who would have paid that purchase price to anyone then holding those shares.  All we know for sure here, by contrast, is that the buyer, PixarBio, was in the market for a reverse merger, and was willing to pay Sargent in part for something that Persaud could not offer -- a controlling block of shares in a shell company.  We thus cannot know with confidence on this record that there was any party that was willing to pay $2.50 a share to Persaud.

In sum, if we are trying to determine whether the record makes manifest that it is beyond reasonable dispute that Persaud sold shares to Sargent for a pittance that he could have sold for a ton, then Sargent's complicated deal with PixarBio shows no such thing.  In fact, as best I can tell, the last person to have put a value on standalone S-1 shares in BMP before the pump-and-dump scheme had been put into effect was Sargent himself.  Yet the uncontradicted record shows that Sargent wanted to pay 25 percent less for those shares than the 11 cents-a-share that Persaud

ultimately got him to pay for them -- a fact that hardly shows that Persaud was selling those shares on the cheap.

**V.**

I understand that the SEC needs a practical means of proving assertedly arms-length transactions to be nothing of the sort when they are shams. I also understand the SEC's interest in an expansive notion of underwriter status, given the difficulty of proving involvement in fraud. But that need and interest cannot justify our finding control as a matter of law in a case in which evidence of an extreme, unexplained price disparity is most uncertain and direct evidence in the form of the putatively controlled party's successful counteroffer is present.

Doing so would undermine the jury's important role in SEC enforcement actions. It also would permit the SEC to regulate transactions that a reasonable factfinder could find Section 5 exempts and thereby risk subjecting the securities market to regulation that Congress did not intend.

I thus respectfully dissent from the majority's holding that the SEC was entitled to summary judgment on its Section 5 claim in this case and so do not reach the issues concerning remedies for the alleged violations of that provision. I otherwise join, however, in the majority's opinion.